**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al.,
Defendants.**

No. 88 Civ. 4486 (DNE).

United States District Court,
S.D. New York.

March 6, 1989.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Randy M. Mastro, Marla Alhadeff, Richard W. Mark, Allan N. Taffet, Asst. U.S. Attys., and Peter C. Sprung, Sp. Asst. U.S. Atty., New York City, of counsel), for U.S.

Mudge Rose Guthrie Alexander & Ferndon (Jed S. Rakoff, Audrey Strauss, Bart Timothy Schectman, and Ralph P. DeSanto, New York City, of counsel), for defendant Intern. Broth. of Teamsters.

## OPINION & ORDER

EDELSTEIN, District Judge:

### BACKGROUND

The United States Government has filed a civil complaint alleging a massive racketeering enterprise and a conspiracy to participate in such an enterprise, pursuant to provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The complaint names as defendants the International Brotherhood of Teamsters ("IBT" or "Union"), its General Executive Board ("GEB" or "Board"), the individual members of the Board, the Commission of La Cosa Nostra ("LCN")[1], and 26 alleged members of La Cosa Nostra. The Government seeks sweeping relief, including the ouster of the members of the Board, the appointment of a "court liaison officer" to oversee reforms in the Union's supervision of its subordinate entities as well as in its election procedures, and orders permanently enjoining the Board members and the LCN defendants from participating in the affairs of any labor organization.

By order to show cause, the Government sought a preliminary injunction. Upon hearing the parties, and in light of the unprecedented nature and scope of this action, the court denied the application and ordered expedited discovery and an early trial date that would consolidate the hearing for permanent and preliminary relief. The Union, the Board, and several individual defendants[2] filed motions to dismiss the complaint, which the court now addresses.

The Union contends that the Government's complaint should be dismissed on three grounds: (1) the complaint violates the defendants' first amendment right to association; (2) federal labor law preempts RICO in the context of labor unions; (3) the complaint fails to state a RICO claim.

Individual defendants have also moved to dismiss the complaint for lack of jurisdiction and for lack of timeliness. Defendant Joseph Massino has also moved for dismissal on grounds of comity. The Union also moves for an order requiring the joinder of indispensable parties and an order transferring this action to the District of Columbia. For the reasons stated below, the motions are denied.

The Government has also moved for (1) entry of default judgments against certain individual defendants and the Commission of La Cosa Nostra; (2) orders granting summary judgment against certain individual defendants; (3) leave to amend the complaint; and (4) an order striking the jury demands filed by some of the individual defendants. For the reasons stated below, the motions are granted except for the motion for summary judgment.

## I. THE MOTIONS TO DISMISS

### A. *First Amendment Challenge to RICO Claim Against IBT*

The IBT contends that the Government's complaint attacks activity protected by the first amendment as well as acts that may be constitutionally proscribed. The IBT has identified five types of such conduct attacked by the complaint: (1) Association by IBT officers with persons having known criminal histories or criminal records, *see* IBT Memo at 10; (2) IBT officers meeting with and giving approval and support to former candidates for various union offices, who were supported by the LCN, *id.* at 11; (3) failure by the Union to accept charges made by the United States in various criminal indictments, *id.;* (4) statements made by the Union in its official publication, the *International Journal, id.* at 12–13; (5) association of IBT officers

---

1. La Cosa Nostra literally means "Our Thing" in Italian, and is a term commonly used by law enforcement personnel to denote organized crime.

2. The individual defendants moving to dismiss the complaint are: Weldon Mathis, Joseph Trerotola, William J. McCarthy, Joseph W. Morgan, Edward M. Lawson, Arnold Weinmeister, Donald Peters, Walter J. Shea, Harold Friedman, Jack D. Cox, Don L. West, Michael J. Riley, Theodore Cozza, Daniel Ligurotis, Joseph Massi-

no, Joseph Lombardo. The following defendants, who originally moved to dismiss, have entered into consent judgments with the Government and are no longer defendants in the case: Robert Holmes, Sr., John H. Cleveland, Maurice R. Schurr, Francis Sheeran.

With respect to those issues upon which all the movants' arguments coincide, references to the Union will be deemed to refer to all the movants that have joined in the Union's application.

with certain individuals named in the complaint or any LCN member or associate.

The Union contends that intermingling activity protected by the first amendment with alleged activity properly proscribed by RICO is constitutionally impermissible, and therefore, the complaint should be dismissed. The Union relies primarily on the case of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed. 2d 1215 (1982).

*Claiborne* arose out of a boycott of white merchants in Claiborne County, Mississippi organized in 1966 by the local NAACP leaders. The boycott was organized to secure compliance with a long list of demands for equality and justice. Although the boycott was primarily enforced by speeches and nonviolent picketing, some threats, as well as acts, of violence occurred. The white merchants filed suit to recover profits lost over a seven year period. The Mississippi Supreme Court upheld liability on the theory of common law tort on the ground that NAACP had agreed to use violence and threats of violence to enforce the boycott.

The United States Supreme Court reversed the Mississippi court's ruling. The Court first concluded that the nonviolent aspects of the boycott were clearly protected by the first amendment. *Claiborne, supra*, 458 U.S. at 911, 102 S.Ct. at 3424. Moreover, as a primarily political activity, the boycott was not within the scope of activity properly subject to state regulation. Accordingly, the court reasoned, liability could not be imposed on all coconspirators for violent acts by some individuals, when the "conspiracy" was largely nonviolent and involved constitutionally protected association.

The IBT contends that the Government complaint in this case seeks to accomplish what *Claiborne* has prohibited, namely, attacking protected and unprotected activity, intertwined by RICO and conspiracy theories. The analogy, however, is less than compelling. At the heart of the IBT's argument lies the notion that the Government seeks a remedy that may impinge on putative first amendment rights, such as the right of union officers to associate with whomever they please, including alleged or proven organized crime figures. The issue of the appropriate scope for relief, if any is warranted by the proof adduced at a trial, should be determined by court in its discretion after a hearing.

The usual question presented by a motion to dismiss is whether the plaintiff, in this case the Government, can prove any set of facts that would entitle it to relief. In some cases, the threat to first amendment rights is so clear and so immediate that a dismissal of the complaint is deemed appropriate. *See Franchise Realty Interstate Corp v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir.1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). In the case before this court, however, it is not clear from the face of the complaint that any relief granted upon proof of the allegations of the complaint would necessarily violate the first amendment.

It is also clear that the Government complaint does not seek to proscribe lawful union activity such as honestly representing workers and providing union benefits. The complaint addresses itself only to alleged violations of RICO, which are not protected by the first amendment. The categories of allegedly protected activity challenged by the complaint cannot be analyzed in a vacuum. Purely political association, even with individuals who have a criminal history, is protected by the first amendment. Nevertheless, when such association is part of a plan to commit a crime it no longer is protected. Otherwise, it is apparent that any RICO enterprise or conspiracy could never be prosecuted because they all involve "association." "Freedom of association" is not, however, a talisman that will ward off all government attempts to proscribe or regulate activity. It is only *lawful* association that is protected, not association for a criminal or unlawful purpose. The IBT argument begs the question by asserting that the association alleged in the complaint is protected by the first amendment. If such association was innocent, and for the lawful, and laudable, purpose of political discussion, advancement of labor issues, or any other cogniza-

ble, protected purpose, the IBT will have ample opportunity to demonstrate that at trial. In the meantime, such an argument does not persuade the court that the *allegations* of the complaint offend first amendment principles.

### B. *Preemption of RICO by Federal Labor Law*

The IBT contends that the federal labor laws preclude the application of RICO to the allegations in the complaint citing the history of labor law in the United States, and the scope of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.* ("LMRDA") and the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"), to support its argument. The Union characterizes the allegations in the complaint as falling in two groups: (1) a challenge to IBT elections, and (2) unfair labor practices depriving IBT members of their rights to organize and bargain collectively. After such characterization, the Union concludes that the LMRDA and NLRA created those rights and provide exclusive mechanisms for their protection.

■ Section 481 of the LMRDA set forth the procedures and rules governing union elections. Section 482 provides a procedure to challenge the results of an already conducted union election. This procedure requires a complaint to the Secretary of Labor, after exhausting remedies provided by the union. The Secretary is then required to conduct an investigation. After such investigation, the Secretary must determine whether there is probable cause to proceed with further legal action. Only after such a determination may a lawsuit be instituted to challenge election results, and then only by the Secretary. Section 482 provides that this enforcement procedure "shall be exclusive." 29 U.S.C. § 483.

The Union similarly contends that some of the conduct alleged in the complaint would constitute unfair labor practices under the NLRA. 29 U.S.C. § 157. The National Labor Relations Board ("NLRB") would have exclusive jurisdiction over such charges. *See* 29 U.S.C. § 160.

With respect to the LMRDA, the Union's argument fails to recognize that 29 U.S.C.

§ 482 provides the exclusive remedy for a *union member* to challenge the results of a particular union election. The comprehensive procedure for challenging an already conducted election was devised to "preserve a maximum amount of independence and self-government by giving every international union the opportunity to correct improper local elections." Sen.Rep. No. 187, 86th Cong., 1st Sess., 19–22 (1959), 1959 U.S.Code Cong. & Admin.News, 2318. The action herein is brought by the United States government, not a union member. Thus, the concerns underlying Section 483's exclusivity provision are inapplicable to this case.

■ The central flaw in the Union's argument with respect to both the NLRA and the LMRDA is its initial assumption, namely its characterization—or more accurately, mischaracterization—of the allegations of the Government's complaint. The complaint alleges participation and conspiracy to participate in a RICO enterprise by the LCN defendants and the Board member defendants. Although some of the predicate racketeering acts alleged are mail and wire fraud in connection with union elections and some of the acts could also be construed as unfair labor practices, the complaint does not seek merely to correct those specific alleged acts of wrongdoing. The complaint in this case alleges an unlawful racketeering enterprise and seeks a *civil* remedy to prevent continued violations of RICO. Put another way, the alleged deprivation of union rights are symptoms; the complaint in this case alleges a widespread disease in the Union. The labor statutes are designed to treat these symptoms. RICO was enacted by Congress specifically to cure the disease.

Whether the Government can prove the numerous allegations it levels against the defendants must await trial. At this stage, however, it is clear that the charges of wrongdoing in the complaint far exceed the scope of the federal labor laws. If the allegations are proved at trial it is equally apparent that the federal labor statutes cited by the IBT would not address those acts of wrongdoing.

■ Finally, it is disingenuous for the IBT to argue as it does that the RICO statute was not intended to remedy the sort of conduct alleged in the complaint. The legislative history of RICO [3] reveals that one of the primary goals of the statute was to provide the Government with a tool to attack organized crime's alleged infiltration of legitimate enterprises, including specifically labor unions.

More than "stray comments" with respect to labor unions, the legislative history of the Act is replete with clear statements that the infiltration of legitimate labor unions by organized crime was one of the primary reasons for enacting RICO. The Statement of Findings and Purposes of the Act specifically notes that money derived by organized crime from its traditional criminal enterprises is "increasingly used to infiltrate and corrupt legitimate business and labor unions." Organized Crime Control Act of 1970 Pub.L. 91–452, § 1, 84 Stat. 922, reprinted in 1970 U.S.Code Cong. & Admin.News 1073. In its Statement in Justification of the Act, the Senate quoted the President of the United States: "It [organized crime] quietly continues to infiltrate and corrupt organized labor." S.Rep. No. 91–617, 91st Cong., 1st Sess. 35 (quoting H.R.Doc. No. 91–105, 91st Cong., 1st Sess. at 1–2 (1969) (President's address on organized crime, April 23, 1969)). In reviewing the RICO provisions of the Act, the Senate devoted a subsection entitled "Takeover of Legitimate Unions" to discussing the infiltration of organized crime into labor unions. *See id.* at 78. The record of the hearings before the Subcommittee on Criminal Laws and Procedure of the Senate Judiciary Committee contains numerous references to the infiltration of organized crime into labor unions.

Whether or not organized crime elements have infiltrated or control the defendant Union is a question of fact that will be determined at trial. That RICO, however, was enacted precisely for the purpose of facilitating the eradication of organized crime elements in legitimate businesses and labor unions is not open to question. Moreover, the legislature intended that RICO be "liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904, 84 Stat. 922. Accordingly, in light of the purpose that RICO address the problem of organized crime in labor unions and in light of the liberal construction clause, the court has no doubt that Congress did not intend that RICO be given limited application in the labor context, notwithstanding the labor statutes cited by the IBT.

## C. *Sufficiency of RICO Allegations*

■ As a threshold matter, the IBT maintains that the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply to all RICO predicate acts, including those allegations not founded on fraud. Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of a mind of a person may be averred generally.

Rule 9(b) by its terms applies to those cases in which fraud or mistake are averred. Some courts, however, have held that the same standard of particularity should be applied to all RICO claims. *See Plount v. American Home Assurance Co.,* 668 F.Supp. 204 (S.D.N.Y.1987); *Schnitzer v. Oppenheimer & Co.,* 633 F.Supp. 92 (D.Or.1985); *Taylor v. Bear Stearns,* 572 F.Supp. 667 (N.D.Ga.1983).

Rule 9(b) is justified, in part, by the stigma that mere allegations of fraud in a complaint can cause. *Plount, supra,* 668 F.Supp. at 205–06; *von Bulow v. von Bulow,* 634 F.Supp. 1284, 1302 (S.D.N.Y.1986). By requiring fraud allegations to be stated with particularity, reputations are less likely to be unnecessarily besmirched when there is no grounds for substantiating fraud. The particularity requirement is also a means for courts summarily to dispose of frivolous lawsuits based on fraud.

---

**3.** RICO was enacted as part of a sweeping reform of the criminal code aimed at organized crime entitled, The Organized Crime Control Act of 1970 ("the Act"). Pub.L. 91–452, 84 Stat. 922, reprinted in 1970 U.S.Code Cong. & Admin. News 1073.

Courts applying the particularity requirement to RICO allegations have reasoned that the purposes advanced by Rule 9(b) are equally served by applying the rule to non-fraud RICO claims. These courts have concluded that RICO allegations are even more damaging to a defendant's reputation by labelling him with the stigma-laden term, "racketeer." *See Plount, supra,* 668 F.Supp. at 206. Moreover, federal courts have a greater need summarily to treat frivolous RICO claims than fraud claims because the civil RICO treble damages clause provides a strong incentive for plaintiffs to convert the garden variety fraud into a racketeering action.

This court is not persuaded by the reasoning of the courts that have applied Rule 9(b) to RICO actions not sounding in fraud, and adopts the reasoning of courts that limit the application of Rule 9(b) to fraud based RICO claims. *See United States v. Bonanno Organized Crime Family,* 683 F.Supp. 1411 (E.D.N.Y.1988); *cf. Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 792 n. 7 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Moreover, the concerns addressed by Rule 9(b) are not relevant in this particular lawsuit. This action was filed by the government and is not seeking treble damages. Therefore, it is not the typical private civil RICO action which is essentially a fraud claim dressed up as a racketeering action. In addition, the Union has faced charges upon charges of corruption and ties to organized crime for the better part of the last four decades. Whether these allegations are warranted or not, the IBT cannot now contend that the mere filing of this lawsuit will tarnish a previously pristine reputation.

Accordingly, the court finds that the particularity requirement of Rule 9(b) applies only to the allegations of fraud in the complaint. The remaining claims must conform to the notice pleading requirement of Rule 8(e)(1).[4] Having established the stan-

dard by which the pleadings will be judged, the court now turns to the IBT's challenges to the sufficiency of each and every element of the government's RICO claims.

### 1. Wire Fraud Allegations

The IBT challenges the wire fraud allegations with respect to the election of past presidents of the GEB. The Union cites the requirements of Rule 9(b) that a complaint alleging fraud must state with specificity:

1. The allegedly fraudulent statements or omissions;

2. The time and place of the statements or omissions;

3. The content of the statements or omissions; and

4. What was obtained as a result of such statements or omissions.

*Beck v. Manufacturers Hanover Trust Co.,* 645 F.Supp. 675, 682 (S.D.N.Y.1986), *aff'd,* 820 F.2d 46 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 698, 98 L.Ed. 2d 650 (1988).

The cases the IBT cites in support its position are securities fraud cases. *Ross v. A.H. Robins,* 607 F.2d 545 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978); *United States v. Dixon,* 536 F.2d 1388 (2d Cir.1976); *White v. Beer,* 679 F.Supp. 207 (E.D.N.Y. 1988). The primary deficiencies found by these courts in the complaint regard the specific fraudulent statements made and when they were made. Underlying the difficulties in these complaints is the factual basis for alleging that the fraudulent parties had knowledge of the falsity of such statements at the time they were made. The question of timing and specificity becomes paramount in a securities fraud case because liability is premised on who knew what when.

The instant complaint differs significantly in two respects. The wire fraud alleged in the complaint is a fraudulent conceal-

---

**4.** Rule 8(e)(1) provides:
Each averment of a pleading shall be simple, concise and direct. No technical forms of

pleading or motions are required.

ment of the alleged role organized crime figures played in the elections of Roy L. Williams and Jackie Presser as presidents of the GEB. The scheme or artifice to defraud alleged by the government was that Williams and Presser, in exchange for their position as Teamster President use their position to give money and economic advantages to LCN members. The GEB members are alleged to have aided and abetted the scheme by supporting both Williams and Presser in these activities.

■ Although Rule 9(b) applies to allegations of fraudulent concealment, *see von Bulow, supra,* 634 F.Supp. at 1302, the particularity required of such allegations differs from that required of allegations of fraudulent misrepresentations. *Id.* at 1303. An allegation of fraudulent concealment satisfies the particularity requirement if it alleges the facts a defendant, who was under a duty to disclose, failed to reveal. *See United States v. Carpenter,* 791 F.2d 1024, 1035 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *von Bulow, supra,* 634 F.Supp. at 1302–03; *accord Cottman Transmission Systems, Inc. v. Dubinsky,* 95 F.R.D. 351, 353 (E.D.Pa.1982).

■ The complaint describes the scheme or artifice to defraud in which the defendants allegedly engaged with sufficient particularity to alert the defendants to the nature of the alleged fraud. As noted earlier, the circumstances surrounding this complaint do not implicate the traditional concerns furthered by Rule 9(b). Further, by its nature, the alleged scheme places most of the particulars of the fraud in question in control of the defendants. Typically the plaintiff is the defrauded party, who has had direct dealings of some type with the defendant. In this case, the Government is not the direct victim of the fraud allegedly perpetrated by the defendants. The Government is in the position of protecting the interests of the membership of the IBT as well as the public in an honest labor union. For all of these reasons, the Government has satisfied the requirements of Rule 9(b) with respect to the wire fraud allegations arising out of the elections of Roy L. Williams and Jackie Presser as IBT President.

### 2. Hobbs Act Allegations

■ The Hobbs Act provides in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion, or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

The elements of a Hobbs Act violation are: (1) Obtaining property from another; (2) by wrongful use of actual or threatened violence; (3) an effect on interstate commerce. 18 U.S.C. § 1951(a) & (b)(2); *see United States v. Enmons,* 410 U.S. 396, 397, 93 S.Ct. 1007, 1008, 35 L.Ed.2d 379 (1973).

The Government's complaint alleges Hobbs Act violations as predicate acts to its RICO allegations. These violations are essentially that the defendants and others created a climate of intimidation and fear that deprived union members of their rights to self-determination, as provided by the LMRDA. The IBT challenges the sufficiency of these allegations contending (1) that the rights to vote free from intimidation as provided by the LMRDA are not property rights as intended by the Hobbs Act; (2) that the acts of violence and intimidation cited in the complaint are merely random acts of violence, unconnected to any conspiracy or enterprise involving the GEB members; and (3) that the complaint insufficiently alleges an effect on interstate commerce.

In 1987, the United States Supreme Court handed down the decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* arose from the mail fraud conviction of a Kentucky public official for accepting payments in exchange for giving state insurance business to certain insurance compa-

nies. The indictment alleged that the defendant had deprived the Commonwealth of Kentucky of his faithful and honest service. The Supreme Court reversed the conviction, holding that the intangible right to honest service by a public official does not constitute "property" within the meaning of the mail fraud statute.

The Supreme Court focused its analysis in *McNally* on the legislative history of the mail fraud statute and the purpose for which it was adopted. *See McNally, supra,* 107 S.Ct. at 2879–81. The court concluded that the mail fraud statute was enacted to criminalize the use of the mails to conduct swindles on the public. The court chose a narrow construction of the statute partly because "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *Id.* at 2881 (citing *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)). In addition, the court appeared uneasy about involving the "Federal Government in setting standards of disclosure and good government for local and state officials." *Id.*

Soon after, the Supreme Court clarified the scope of *McNally,* in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). *Carpenter* arose from the mail fraud conviction of Foster Winnans, a former reporter for the Wall Street Journal. Winnans was the author of an influential weekly column that discussed selected stock and gave a prognosis for the performance of those stocks. The column, widely read and respected, was capable of affecting the price of the stocks it discussed. Winnans, in violation of his employment agreement with the Journal, engaged in a scheme to reveal the timing and contents of future columns to his coconspir-

ators. This information enabled the coconspirators to make trades in the stocks in question based on the anticipated effect the column would have on the price of those stocks.

The defendants challenged the convictions claiming that the Journal's right not to have the column's contents revealed before publication was not "property" within the meaning of the mail fraud statute, as interpreted by the Supreme Court in *McNally.* The Supreme Court upheld the convictions. The Court reasoned that even at common law an employee owes a fiduciary duty to his employer. The information Winnans revealed was the Journal's business property to which it was entitled exclusive use. In addition, the Journal's employment manual contained a prohibition against appropriation of confidential business information. The court thus concluded that the right not to reveal the contents of the column before publication constituted property for purposes of the mail fraud statute, thereby dispelling the notion that "intangible" rights cannot come within the ambit of "property" as defined in the mail fraud statute.

The IBT contends that *McNally* applies to the Hobbs Act and accordingly, the Government's complaint is deficient because the "property" allegedly extorted by defendants, namely LMRDA rights, does not meet the requirements of *McNally.* The court questions whether *McNally* applies at all to analysis of the Hobbs Act. *See United States v. Local 560 (I.B.T.),* 694 F.Supp. 1158, 1188 (D.N.J.1988); *Northeast Women's Center, Inc. v. McMonagle,* 689 F.Supp. 465, 474 (E.D.Pa.1988).[5] The Hobbs Act, unlike the mail or wire fraud statutes, was enacted specifically to address labor racketeering. In enacting the Hobbs Act, Congress also sought to avoid

---

5. The IBT cites *United States v. Aguon,* 851 F.2d 1158, 1175 (9th Cir.1988) (Reinhardt, J. concurring), for the proposition that the Hobbs Act must be reevaluated in light of *McNally.* Judge Reinhardt's concurrence in *Aguon* cites *McNally* for the proposition that criminal statutes should be interpreted more narrowly, if two interpretations are possible. *See Aguon, supra,* 851 F.2d at 1175. *Aguon,* however, was decided before

*Carpenter* clarified the Supreme Court's view of the mail fraud statute. More important, *Aguon* involved interpretation of the Hobbs Act as it applies to a public official's exercise of his or her powers. It did not in any way implicate the Act's definition of property. Accordingly, this court does not view *Aguon* as apposite to the issue before this court.

the need to prosecute individuals for incidental violations such as mail fraud or income tax evasions. S.Rep. No. 532, 73d Cong., 2d Sess. 1 (1934). The statute was also intended to have a broad scope. "[The] statute is designed ... to extend federal jurisdiction over all restraints of any commerce within the scope of the federal governments constitutional powers." *Id.* Finally, *McNally* was based on statutory construction and a study of the legislative history of the mail fraud statute. It is apparent that simply adopting that analysis, particularly in light of the differences in the purpose and legislative history of each statute, would be inappropriate.

Even assuming *McNally* and *Carpenter* were to apply in the Hobbs Act context, the court finds that the rights guaranteed by the LMRDA to union members are "property" within the meaning of the Hobbs Act. *Carpenter* made clear that the Supreme Court did not intend to eliminate from the purview of the mail fraud statute all intangible rights. The holding of *McNally* is limited to the "standards of disclosure and good government for local and state officials." *McNally, supra,* 107 S.Ct. at 2881. In the instant case, there is no doubt as to the standards to which labor officials ought to be held; the LMRDA sets forth with particularity the standards of disclosure to which labor leaders must adhere and the fiduciary nature of labor leaders position. Thus, characterizing those rights created by the federal labor statutes as "property" does not involve the federal government in setting arbitrary standards for conduct in the way that the same characterization of the ethereal and changeable notions of "good government" or "honest and faithful services" would. Consequently, in light of *McNally* and *Carpenter,* this court finds the rights implicated herein to be more akin to the intangible rights held protectible as property in *Carpenter* than the rights held not to be property in *McNally.*

The IBT also challenges the sufficiency of the allegations with respect to intimidation. The Union primarily argues that specific acts alleged in the complaint are either not threatening or that some allegations would not in and of themselves consti-

tute extortionate acts. This challenge has no merit at this stage. The complaint alleges that all of the acts in the complaint taken together created an atmosphere wherein Union members were led to feel intimidated, threatened, or pressured in the exercise of their rights to Union democracy. This question is largely a factual one that may only be determined after a trial. Taken as a whole, this court cannot say that the Government cannot prove any set of facts that would establish by a preponderance of the evidence that the defendants created a climate in which Union members felt threatened in the exercise of their rights.

▪ Finally, the contention that the allegations of interstate commerce are insufficient hardly merits discussion. As noted *supra,* the reach of the Hobbs Act was intended to extend to the limit of Congress' constitutional power. There can be little doubt that the complaint alleges a sufficient effect on interstate commerce. There is virtually no realm that implicates interstate commerce as directly and forcefully as organized labor on an international level.

Accordingly, the court finds that the complaint sufficiently alleges Hobbs Act violations as a RICO predicate offense.

### 3. Mail Fraud Allegations

The IBT also challenges the mail fraud allegations in the complaint. The Union contends: (1) that the allegations fail to state fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; (2) that the benefit alleged to have been deprived by the scheme is too speculative; and (3) that the allegations of fraud do not in any event support the RICO allegation of acquiring or maintaining control of a racketeering enterprise.

▪ As to the issue of particularity, the standards have been set forth *supra* in the discussion of the mail fraud allegations. As with the mail fraud allegations, the wire fraud allegations address fraudulent concealment of the role of organized crime in GEB decisions. The concealment is alleged

with all the particularity that is required, perhaps all the particularity that is possible. The plaintiff herein, the Government, was not the direct victim of the alleged fraud and therefore, the information is especially within the control of the defendants. The facts not revealed are stated particularly: namely, the role played by organized crime in the Union's affairs. No more need be alleged in a case of fraudulent concealment. Therefore, for the reasons set forth *supra,* the allegations of mail fraud also satisfy Rule 9(b).

■■■ The contention that future economic benefits are too speculative to form the basis for a mail fraud allegation is likewise rejected. Clearly, wages and benefits are property even under the most restrictive reading of *McNally.* The fact that some benefits are alleged to accrue in the future in no way changes this conclusion. If the Government can prove that future benefits would have been denied, this element of mail fraud would be established. A future entitlement is just as surely property as money or other current property rights.

■■■ Finally, the contention that the mail fraud allegations do not support a Section 1962(b) offense is without merit. 18 U.S.C. § 1962(b) proscribes the acquisition *or* maintenance of and interest in a racketeering enterprise. The alleged fraudulent concealment could certainly be a predicate act to maintaining control of an alleged racketeering enterprise. Although, as the IBT points out, the acts alleged in this portion of the complaint presuppose a degree of control of the enterprise, the concealment would definitely further the maintenance of such interest or control. There can be little doubt that a public announcement by the GEB that it was, as the Government alleges, under the control of organized crime figures would have dealt a serious blow to the continued maintenance of an interest in the alleged racketeering enterprise.

Accordingly, the court finds that the allegations of mail fraud are sufficient to state a claim.

### 4. Remaining RICO Predicate Acts

The IBT challenges the remaining set of allegations of RICO predicate acts on the ground that they lack sufficient interrelatedness to support a claim under RICO. By this complaint, the Government has cast a very wide net indeed. It alleges a wide-ranging enterprise at the highest levels of the largest labor union in the world and of organized crime. Its alleged goals and means are varied. Whether the Government has been too eager or aggressive in its allegations depends on whether it can prove that this massive alleged enterprise and conspiracy existed. The complaint alleges that these acts were related to the alleged enterprise. The Government also alleges that this enterprise continues to exist and seeks prospective relief to dismantle it. The court cannot at this stage say that no set of facts can be proved that would demonstrate that the acts alleged in this portion of the indictment are related to the enterprise it alleges. The Government will have to demonstrate at trial not only that these acts occurred but that they are related to each other such that they constitute a pattern of racketeering activity. *See United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989).

### 5. Other RICO Elements
#### a. *Pattern Requirement*

■■■ The IBT also challenges the sufficiency of the allegations in the complaint with respect to the pattern of racketeering element of RICO, as defined by 18 U.S.C. § 1961(1). The Second Circuit, sitting *en banc,* has recently clarified the meaning of the "pattern" requirement in *United States v. Indelicato,* 865 F.2d 1370. The Court held that a pattern of racketeering requires proof of at least two predicate acts that are interrelated. *See id.* at 1382. The Court also held that "interrelatedness" may be established in a variety of ways such as, temporal proximity of the acts, a common goal, or a similarity of methods. *See id.* at 1382–1383. The acts may also be shown to be related by the nature of the enterprise. Thus, acts that may themselves not be directly related may neverthe-

less be found to be related for the purpose of establishing a pattern if the acts are related to the enterprise. As stated in *Indelicato:*

> Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity. Even where the enterprise is legitimate, if the racketeering acts were performed at the behest of an organized crime group, that fact would tend to belie any notion that the racketeering acts were sporadic or isolated.

*Id.* at 1383–1384. It is clear that the nature of the enterprise is a consideration in determining relatedness and a pattern.

The IBT's argument is unpersuasive because taking the allegations as a whole, including the nature of the enterprise, it cannot be said that the Government can adduce no set of facts that would demonstrate a finding of a "pattern of racketeering." As noted earlier, the enterprise alleged in the complaint is extensive. Although the acts alleged occurred over a period of time and in a variety of places, based on the principles set forth in *Indelicato,* they may be shown sufficiently related to each other or the enterprise to establish a pattern of racketeering.

### b. *Role of the Individual Defendants*

■ The GEB member defendants, as well as the Union, contend that each officer's role in the enterprise is not adequately alleged in the complaint. With respect to the defendants who allegedly committed substantive acts of racketeering,[6] there is no doubt that their role is sufficiently alleged. As to the other defendants, the Government is advancing a theory of collective liability based on a failure to act when there was a duty to do so. Each defendant officer is a fiduciary with respect to the Union members. They have a duty to disclose and remedy wrongdoing by the IBT. When officers engage in collective wrongdoing, courts have recognized

the propriety of collective pleading. *See, e.g., Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y.1983); *Pellman v. Cinerama, Inc.,* 503 F.Supp. 107, 111 (S.D.N.Y.1980). Therefore, the court concludes that this is an appropriate case in which to allow pleading of collective action.

Moreover, the complaint adequately alleges that the GEB members in question aided and abetted others by failing to act when they had such a duty. The Third Circuit recognized the adequacy of such allegations based on the position of trust occupied by union officers. *See United States v. Local 560 of Intern. Broth., etc.,* 780 F.2d 267 at 284 (3rd Cir.1985). In addition, the complaint alleges that the lack of knowledge of particular officers could only have resulted from conscious avoidance of the facts. The scope of the enterprise only through conscious avoidance could a member of the GEB not have had any knowledge that would have required him to exercise his fiduciary duty to act. Accordingly, the court finds that the allegations are sufficient to support a claim in this action based on a theory of collective liability and conscious avoidance of knowledge.

### c. *Enterprise*

■ The IBT also challenges the sufficiency of the allegations of an "enterprise," calling it "an artificial concoction." IBT Memo. at 54. "[An] 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). All of the parties listed in the complaint as part of the enterprise, as well as the enterprise itself, fall within the scope of § 1961(4). Therefore, this argument is rejected.

### d. *The GEB as a Proper Party*

The IBT further contends that the GEB is not a proper defendant herein because it is a "purely organizational unit" that is not

---

**6.** These defendants are Joseph Trerotola, Daniel Ligurotis, Donald Peters, Weldon Mathis, and Joseph Morgan. The other GEB members accused of substantive acts have entered consent judgments with the Government.

alleged to be part of the RICO enterprise and not accused of any wrongdoing. *See* IBT Memo. at 55. If, as the IBT contends, the GEB is "purely organizational" and is not a person within the meaning of RICO, the IBT's motivation in having the GEB dismissed from the case is unclear. Nevertheless, the Government concedes that the GEB is a "nominal" defendant for the purpose of facilitating an adequate remedy should the court find that the Government has made out its case. The court at this time has no factual basis to determine that the GEB is not a cognizable entity. At the present, there appears to be no prejudice to the GEB as an entity by remaining listed as a defendant on the complaint. Even by the Government's own account, the GEB is only named as a defendant for the purpose of effectuating any possible relief. If the GEB is found not to be legal entity, then it clearly cannot even serve that purpose. Therefore, if in the course of events it becomes clear that the GEB is not a proper defendant because it is in fact not a person under 18 U.S.C. § 1961(3), this application to dismiss the complaint as to the GEB may be renewed.

e. *Appropriateness of Relief Requested*

■ The IBT finally contends that the relief requested cannot be supported by the allegations of the complaint. The Government requests equitable relief. Courts have broad discretion at common law to fashion appropriate and just equitable relief. As the old axiom says, "Equity does justice, and not by halves." Moreover, section 1964(a) of RICO grants sweeping powers to the federal district courts to fashion appropriate civil remedies for RICO violations. At this stage, the relief requested cannot mandate a dismissal of the complaint. If the Government prevails at trial, then it will be the court's responsibility to fashion an equitable remedy to restrain future violations of RICO, that makes "due provision for the rights of innocent persons." 18 U.S.C. § 1964(a).

The remainder of the challenges to the sufficiency of the complaint are found to be insubstantial and accordingly rejected. For the reasons stated above the motions

to dismiss the complaint for failure to state a RICO claim are hereby denied.

6. Timeliness of RICO Claims

■ Many individual defendants contend that this action is time-barred under RICO's four year statute of limitations for civil actions. *See Agency Holding Corp. v. Malley–Duff & Associates*, 483 U.S. 143, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987). This statute of limitations, however, is limited to civil enforcement actions seeking treble damages, brought by private plaintiffs. *Malley–Duff* "borrowed" the four year limitations period from the Clayton Act because both statutes were intended to provide an incentive for "private attorneys general."

■ In this case, the plaintiff is the United States Government. The *Malley–Duff* rationale is, therefore, inapposite. Moreover, Congress has acknowledged that neither a statute of limitations nor the doctrine of laches applies to Government RICO actions to enforce public policy. S.Rep. No. 617, 91st Cong., 1st Sess. at 160; *see also Bonanno, supra*, 683 F.Supp. at 1458. Accordingly, the defendants' motions to dismiss on the ground that the RICO claims are time-barred are denied.

7. Jurisdiction Over Individual Defendants

■ The members of the GEB, except Shea and Trerotola, and Joseph Lombardo have asserted lack of proper service and lack of personal jurisdiction as a basis for dismissal. 18 U.S.C. § 1965(d) provides for nationwide service of process in a civil RICO action. All of the defendants, except Edward Lawson, were served personally within the United States. Mr. Lawson was personally served in Canada, pursuant to Rule 4(i)(C) & (E), which authorizes personal service in a foreign country when a federal statute authorizes nationwide service of process. Therefore, there is no doubt that service was properly made pursuant to statute and the Federal Rules of

Civil Procedure.[7]

The defendants also contend that the exercise of personal jurisdiction over them violates the due process clause of the fifth amendment. This circuit has adhered to the standard set forth in *Mariash v. Morrill*, 496 F.2d 1138 (2d Cir.1974) that nationwide service of process is constitutionally permissible. District courts have uniformly held that nationwide service of process is constitutional even under the standards set forth in *Insurance Corp of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 701, 102 S.Ct. 2099, 2103, 72 L.Ed. 2d 492 (1982). *See Steinberg & Lyman v. Takacs*, 690 F.Supp. 263 (S.D.N.Y.1988); *First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon*, 634 F.Supp. 1341, 1349 (S.D. N.Y.1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rajcher*, 609 F.Supp. 291 (S.D.N.Y.1985); *Colavito v. Hockmeyer Equipment Corp.*, 605 F.Supp. 1482 (S.D. N.Y.1985). Absent a clear indication from the Second Circuit or the Supreme Court that nationwide service of process is not constitutional, in light of the consistent rulings of the courts within this district, the court finds nationwide service of process to meet the requirements of due process.

Accordingly defendants' motion to dismiss for lack of personal jurisdiction is denied.

8. **Motion to Dismiss as to Defendant Massino**

Defendant Massino contends that the complaint should be dismissed as to him based on the "first to file" rule. Massino has an action pending in the Eastern District of New York, *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411. Under the "first to file" rule, when two actions involving the same parties and subject matter are filed in two different district courts, the first suit filed has priority. This rule preserves judicial resources and reduces the possibility of inconsistent determinations in parallel proceedings.

The subject matter of the *Bonanno* case and the instant complaint are not identical. The parties in the two cases are different. The allegations in the *Bonanno* case involve the activities of the Bonanno Organized Crime Family's activity in New York, including its alleged influence over Local 814 of the Teamsters Union. The instant complaint alleges a nationwide enterprise whose nature exceeds by far the scope of the *Bonanno* case.

The basis for dismissal urged by Massino is the concept of abstention and comity. These doctrines are discretionary with the court. There are major differences between these two cases. The "first to file" rule, therefore, is inapposite in this case. Accordingly, the court finds no basis to abstain in this case and defendant Massino's motion to dismiss is denied.

## II. MOTION TO JOIN INDISPENSABLE PARTIES

Pursuant to Rule 19 of the Federal Rules of Civil Procedure, the IBT contends that either the complaint must be dismissed or all of its Local Unions, Joint Councils, Area Conferences, and Benefit Funds ("Subordinate Teamster Entities") must be joined as defendants. Rule 19(a) states, in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... (2) the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action

---

**7.** Moreover, the court authorized personal service on all of the defendants by the Order to Show Cause dated June 28, 1988. Therefore, the method of service not only satisfied federal statutes and court rules, it was made pursuant to court order. This court order also demonstrates a finding by the court that nationwide service promotes the ends of justice as required by 18 U.S.C. § 1965(b). Clearly, the fact that the enterprise alleged by the Government operated and continues to operate in various states would satisfy the ends of justice requirement. There is no single district in which each individual member of the alleged enterprise could be found.

in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest.... Fed.R.Civ.P. 19(a).

The Union contends that these Subordinate Teamster Entities have a vital interest in this action that will remain unprotected in their absence. The cited portion of Rule 19(a) and the rule governing intervention of right, Fed R.Civ.P. 24(a)(2) are similar. The IBT vigorously claims it is a separate and independent entity with little or no control over the Subordinate Teamster Entities. Nevertheless, it is revealing that the Union has taken on the cause of these entities when, if the Union's argument is correct, these very entities could have attempted to intervene in this case to protect that interest.

In any event, it is apparent that although the outcome of this litigation may have ramifications for the conduct of business by the Subordinate Entities, they do not have an interest relating to the "subject matter of the action." The relief requested relates to the IBT. It does not directly affect the rights of the Subordinate Entities. Moreover, to the extent that any rights of the Subordinate Entities may be incidentally implicated, the IBT has an obligation to protect those interests. Further, because these entities are not parties, any determination in this case would not be preclusive as to them. Finally, the practical consequences of a judgment for the Government would not in the court's view warrant a finding that these entities are necessary parties.

Accordingly, the court finds that the Subordinate Teamster Entities are not "necessary" parties as defined by Rule 19(a), and the IBT's motion is hereby denied.

### III. MOTION TO TRANSFER VENUE

█ The final IBT application is a motion to transfer venue to Washington D.C., pursuant to 28 U.S.C. § 1404. Section 1404 provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404. The decision whether to grant a motion to transfer lies within the discretion of the court. *Phillips v. Kidder, Peabody & Co.*, 686 F.Supp. 413 (S.D.N.Y.1988). The burden of establishing that a transfer is appropriate is on the moving party, *see Richardson Greenshields Securities, Inc. v. Metz*, 566 F.Supp. 131 (S.D.N.Y.1983), and the plaintiff's choice of forum is entitled to substantial deference. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

█ The main reason the IBT advances in support of the transfer is that many of the documents sought by the Government are located in Washington D.C. Although this is a significant factor, there are numerous other factors that demonstrate Washington D.C. is not a more convenient forum. For example, the majority of the named defendants do not reside in Washington. In fact, the members of the GEB reside at various locations throughout the country, and the remaining individual defendants do not reside in Washington. As to prospective witnesses, the IBT contends many of them are Government agents who reside in Washington. In so far as these witnesses are employees of the plaintiff, this point merits no discussion. As to the situs of the operative facts, there is no one geographical location in which these alleged acts occurred, and many of them allegedly occurred in the Southern District and the tri-state area.

In light of the proximity between New York and Washington, a transfer of venue would make little difference in terms of convenience to the parties. The court finds that the IBT has failed to carry its burden under § 1404. Accordingly, the motion to transfer venue is denied.

### IV. GOVERNMENT'S MOTIONS

#### A. *Default Judgments*

The United States Government has moved for entry of default judgment against Gennaro Langella, Nicholas Marangello, John Tronolone and the Commission

of La Cosa Nostra.[8] The individual defendants were personally served with the copies of the summons and complaint, receipt of which was acknowledged. *See* Docket Entries 104, 105, 111. The Commission of La Cosa Nostra was served by personal service on one of its members. *See* Docket Entry 116. None of these defendants has answered the complaint or appeared in the action.[9] As the time to respond has long since expired, the Government has leave to enter a default judgment pursuant to the Local Rules of this district.

### B. *Summary Judgment*

 The Government has also moved for orders granting summary judgment with respect to Carmine Persico, Joseph Massino, Joseph Lombardo, Angelo LaPietra, and Frank Balistrieri.[10] The Government contends that it is entitled to summary judgment against defendants Persico and Massino based on their prior RICO convictions. With respect to defendants Lombardo, LaPietra, and Balistrieri, the Government contends that their prior criminal convictions for crimes that are predicate acts under RICO, 18 U.S.C. § 1961(1), warrant entry of summary judgment. For the reasons stated below the Government's motion is denied.

To prevail on a motion for summary judgment the movant must establish that there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing a lack of genuine dispute as to any material fact and the evidence and inferences drawn therefrom must be viewed in the light most favorable to the party opposing summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Although summary

judgment is an effective tool to provide just and speedy relief, *Celotex Corp v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), it is not appropriate when there remain issues of fact to be determined with respect to essential elements of a claim.

A RICO claim requires proof of (1) an enterprise, and (2) either participation in the enterprise or the acquisition or maintenance of an interest in or control of the enterprise through a pattern of racketeering. A pattern of racketeering requires proof of at least two acts of racketeering committed within 10 years of each other coupled with proof of continuity. *See United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989).

18 U.S.C. § 1964(d) provides:

A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

In the typical case, § 1964 allows the Government to institute a civil RICO proceeding parallel to a criminal RICO prosecution, alleging essentially identical conduct. *See, e.g., United States v. Local 30, United Slate, Tile and Composition Roofers*, 686 F.Supp. 1139 (E.D.Pa.1988); *United States v. Local 6A, Cement & Concrete Workers Union*, 663 F.Supp. 192 (S.D.N.Y. 1986); *United States v. Ianniello*, 646 F.Supp. 1289 (S.D.N.Y.1986), *aff'd*, 824 F.2d 203 (2d Cir.1987). The civil RICO actions usually allege conduct that is either identical to or a subset of the criminal RICO allegations.

---

**8.** The Government also sought default judgments against Anthony, Nunzio, and Salvatore Provenzano. Salvatore and Nunzio Provenzano have entered into consent judgments with the Government. Anthony Provenzano has passed away since the filing of the complaint. Accordingly, the motion is moot as to these defendants.

**9.** John Tronolone telephoned chambers through his wife before the first hearing on the Order to Show Cause, dated June 28, 1988, to communicate that he could not attend the hearing. He

subsequently sent a letter to chambers saying he had no money and could not afford a lawyer. He did not, however, attempt to answer the complaint as other defendants did, acting *pro se*.

**10.** The Government also sought summary judgment against Francis Sheeran. Mr. Sheeran has since entered into a consent judgment with the Government; accordingly, the motion with respect to him is dismissed as moot.

Carmine Persico was convicted on two prior occasions for RICO violations. *See United States v. Persico*, S 84 Cr. 809 (S.D.N.Y.), *aff'd*, 832 F.2d 705 (2d Cir.1987); *United States v. Salerno*, 85 Cr. 139 (S.D.N.Y.). These convictions establish that Persico was the head of the Colombo organized crime family, which is based in New York, and that he was a member of the ruling council or Commission of La Cosa Nostra, or the American Mafia. Part of the pattern of racketeering found by the jury consisted of specific criminal acts with respect to two New York locals of the IBT, Local 282 and Local 707. Joseph Massino was previously convicted of RICO violations in *United States v. Rastelli*, 85 Cr. 354 (E.D.N.Y.). The enterprise found in that prosecution included members of the Bonanno Crime Family and officers of Teamsters Local 814. Its purpose was to control the Local's affairs and its Pension and Benefit Funds. Massino was found to be a controlling figure with respect to Local 814.

Defendants Lombardo, LaPietra and Balistrieri, although never convicted under RICO, have all been convicted of crimes that constitute predicate RICO offenses pursuant to 18 U.S.C. § 1961(1). Lombardo was convicted at two separate trials of eight counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952 and nine counts of wire fraud in violation of 18 U.S.C. § 1343. *See United States v. Dorfman*, 81 Cr. 269 (N.D.Ill.), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir.1984), *cert. denied*, 470 U.S. 1003 (1985); *United States v. DeLuna*, 616 F.Supp. 534 (W.D.Mo.1985), *aff'd sub nom. United States v. Cerone*, 830 F.2d 938 (8th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988). *Dorfman* involved the bribery of a United States senator at the expense of the Teamsters' Central States Pension Fund and counted among its defendants, Roy L. Williams, former IBT president. *DeLuna* involved the purchase of Nevada casinos financed by Central States Pension Fund money in which organized crime figures a had hidden interest. There was also evidence of discussions by Lombardo regarding control and influence over the IBT through its GEB officers, particularly its President. LaPietra was convicted of seven counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952. *See DeLuna, supra.* LaPietra was shown to be a member of Chicago organized crime and to have shared in profits its skimmed from the Las Vegas casinos. There was also evidence that LaPietra supported Roy L. Williams as President of the Teamsters. Moreover, LaPietra has asserted his fifth amendment rights and refused to answer substantive allegations in the Government's complaint beyond the convictions in *DeLuna.*

Frank Balistrieri pleaded guilty to one count of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952, and six other § 1952 charges were dismissed pursuant to a plea agreement. *See DeLuna, supra.* The record of *DeLuna* showed that Balistrieri was the head of the Milwaukee La Cosa Nostra.

In light of these convictions, the defendants may not challenge the essential allegations of the convictions. Consequently, these defendants cannot deny the conduct that gave rise to their convictions. As noted *supra*, these convictions constitute racketeering acts pursuant to Section 1961(1) of RICO. Nevertheless, the RICO claims asserted in the complaint are more far reaching than the criminal convictions of the defendants named *supra*, including those convicted of RICO violations. The complaint alleges a far-flung enterprise, the Teamsters International Enterprise, comprised of the IBT, individual members of the GEB, the Commission of La Cosa Nostra, and individual members of La Cosa Nostra. Before judgment can be entered against any of the defendants, the Government must prove that there was such an enterprise and that the racketeering acts committed in furtherance of such enterprise formed a pattern of racketeering as defined in *Indelicato, supra.* Moreover, the Government must show that each defendant engaged in a pattern of racketeering for the purpose of participating in the

enterprise or, maintaining or acquiring an interest in or control of the enterprise.

It becomes apparent that a number of issues of fact with respect to a RICO claim remain to be answered by a trial. The entry of summary judgment at this juncture is inappropriate. Although Persico, Massino, Lombardo, LaPietra, and Balistrieri cannot deny the allegations of the crimes for which they have been convicted, the Government must still prove the remaining elements of RICO against them and the other defendants.

### C. *Motion to Amend Complaint*

■ The Government has moved for leave to amend its complaint in a number of respects. The Government seeks to amend the complaint (1) to reflect the changing composition of the GEB in light of Jackie Presser's death and the appointment of William J. McCarthy as President; (2) to add the Estate of Jackie Presser as a defendant; and (3) to add a number of allegations of continuing RICO violations.

Rule 15(a) of the Federal Rules of Civil Procedure provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The IBT contends that amendment of the pleadings at this stage of the proceeding is "a tactical maneuver designed to prejudice the IBT and other defendants, expand the work of this Court, and delay the trial of this case—and all for no valid reason." IBT Memorandum in Opposition to Motion for Leave to Amend at 9. The Government contends that it is within its rights under the Federal Rules of Civil Procedure to amend the complaint.

As to the technical amendments there is no question that the Government should have leave to amend. With respect to the allegations of continued wrongdoing the question is somewhat closer, but the answer is the same. A RICO enterprise is by its nature continuing. The Government's original complaint alleges that the Teamsters International Enterprise is a continuing enterprise. *See* Complaint ¶ 117. The Government, therefore, ought to have leave to amend the complaint to add examples of the continuing violations it claims have occurred since the filing of the complaint. This conclusion is particular appropriate in light of the fact that the Government sought a preliminary injunction, which was denied pending a consolidated hearing.

The prejudice to the defendants is insubstantial. The new allegations are additional examples of alleged continuing violations and do not constitute a new theory of liability or work any other substantial change in the nature of the complaint. Although the new allegations may require some additional discovery, the court does not anticipate that the trial should be delayed. The allegations remain substantially the same as they were in the original complaint and any additional discovery may be conducted during the trial. In light of the anticipated length of this trial this continuing discovery should not be unduly burdensome. Moreover, as this case will not be tried to a jury, *see infra*, scheduling should prove only a minor obstacle.

The court notes that the scope of the leave granted herein is limited to adding continuing violations *since* the filing of the complaint, and does not encompass the addition of past violations that occurred prior to the filing of the complaint.

### D. *Jury Demands*

■ A number of defendants have filed jury demands with respect to this action. The Government has moved for an order striking those jury demands. Defendants Cox, Cozza, Friedman, McCarthy, Morgan, Persico, Peters, Riley, Shea, Trerotola, Weinmeister, and West have opposed the Government's application.

Absent statutory authorization, the right to a trial by jury, must be inferred from the seventh amendment to the Constitution. *See Brock v. Group Legal Administrators, Inc.,* 702 F.Supp. 475 (S.D.N.Y.1989). The seventh amendment accords the right to a jury trial in those actions involving "rights and remedies of the sort traditionally enforced in an action at law rather than in an action in equity or admiralty."

**1408**

*Pernell v. Southall Realty,* 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974). The issue, therefore, is whether the complaint seeks equitable or legal relief.

The Government's complaint clearly seeks equitable relief in that it seeks injunctions and the appointment of a "court liaison officer." The only demand for relief that would result in the payment of money is the demand for disgorgement of proceeds derived from alleged RICO violations and attorney's fees. Disgorgement and attorney's fees are incidental to equitable relief, and thus not considered actions at law. *See Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 1838–39, 95 L.Ed.2d 365 (1987).

The defendants contend that disgorgement must be viewed as criminal forfeiture, with its concomitant right to a jury trial. A similar argument was rejected in *United States v. Bonanno Organized Crime Family,* 683 F.Supp. 1411 (E.D.N.Y. 1988). The court finds the reasoning of the *Bonanno* court persuasive as to the conclusion that disgorgement is an equitable remedy available to the court under 18 U.S.C. § 1964(a). The monetary relief sought by the Government is aimed at preventing unjust enrichment of the defendants and is not relief pursuant to the criminal forfeiture provisions. As such, the relief is equitable in nature, thereby not giving rise to the right to a jury trial.

### CONCLUSION

The motions to dismiss the complaint are denied in their entirety. Defendant's motion to join necessary parties pursuant to Rule 19(a) is denied. Defendant's motion to transfer venue is denied.

The Government's motion for summary judgment is denied. The motions for leave to amend the complaint, to strike the jury demands, and for entry of default judgments are granted.

SO ORDERED.