UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION XV of the INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

April 18, 1991.

**316**

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Peter C. Sprung, Edward T. Ferguson, III, Asst. U.S. Attys., of counsel), New York City, for the U.S.

Williams & Connolly (Brendan V. Sullivan, Jr. and Howard W. Gutman, of counsel), Washington, D.C., for the International Broth. of Teamsters.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiffs United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous

influence of organized crime through the election and prosecution provisions.

The instant matter, Application XV of the Independent Administrator, presents for this Court's review the Independent Administrator's letter-decision (the "veto decision," annexed hereto as the Appendix) vetoing the appointment of IBT member Jack B. Yager to the GEB as an International Vice president, and as director of the 700,000 member Central Conference of Teamsters (the "appointments"). The Independent Administrator determined that appointing Yager to these positions would (i) further an act of racketeering activity within the definition of Title 18 U.S.C. § 1961, and (ii) contribute directly or indirectly to the association of the IBT or any of its members with La Cosa Nostra. As a result, the Independent Administrator exercised his power to veto such appointments pursuant to his authority at ¶ F.12.(B)(iii) of the Consent Decree.

Because the Independent Administrator's decision to veto the Yager appointment is not arbitrary or capricious and fully supported by the evidence, the veto decision is hereby ·affirmed in all respects.

*I. The Independent Administrator's Findings*

The Independent Administrator considered an exhaustive factual record in making his determination to veto the appointments of Yager. In his decision, the Independent Administrator considered (i) the deposition testimony of Yager; (ii) the deposition testimony of 15 members of the GEB, including General–President McCarthy; (iii) an investigator's report on Yager, (iv) the declaration of FBI Special Agent Peter J. Wacks, which included extensive information compiled by the FBI regarding the IBT and La Cosa Nostra; (v) extensive information relating to former IBT General President and convicted felon Roy L. Williams, including discovery from this case; and (vi) certain other materials from discovery from the instant case taken before the signing of the Consent Decree.[1]

---

**1.** The full list of all of the factual submissions that formed part of the record of this matter are

In vetoing the appointments of Yager, the Independent Administrator relied on two separate grounds under ¶ F.12.(B)(iii) of the Consent Decree, set out below.[2] First, he determined that the appointment of Yager would further an act of racketeering—the aiding and abetting of the extortion of the IBT members rights to union democracy. The Independent Administrator found that former IBT General President Roy L. Williams had extorted IBT members rights to a democratic union, and that as Williams' close confidant and assistant, Yager had aided and abetted Williams in that extortion. Second, he found that the appointment would directly and indirectly further and contribute to the association of the La Cosa Nostra with the IBT.

## A. The Act of Racketeering

The IBT concedes that the Independent Administrator conducted "a massive factual investigation" (Br. at 12) and does not challenge any aspect of the facts supporting this determination. Yager had been an IBT officer for many years. Since 1981, he served as a member of the Policy Committee of the Central Conference of Teamsters, and as Administrative Assistant to Roy Williams. Prior to 1981, Yager had served as a business agent for IBT local 41, and as an organizer for the Central Conference of Teamsters, Freight Chairman, and Freight Division director.

The Independent Administrator found numerous facts concerning Roy L. Williams' ties to organized crime, notably Kansas City La Cosa Nostra boss Nick Civella, Williams' approval of the Central States Pension Fund loans to organized crime controlled entities, and Williams' conviction for conspiring to bribe former United States Senator Howard Cannon at the expense of the Central States Pension Fund. These facts, the Independent Administrator concluded, provided reasonable belief that Williams had committed the act of racketeering of extorting the IBT rank and file's rights under the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411, in violation of the Hobbs Act, 18 U.S.C. § 1951.

In the context of this case, it has previously been found that extortion of rights by IBT officials may constitute a violation of the Hobbs Act. March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1397–1401 (S.D. N.Y.1989); *see United States v. Local 560, International Brotherhood of Teamsters*, 780 F.2d 267, 281–82 (3d Cir.1985), and that aiding and abetting that extortion may constitute an act of racketeering. March 6, 1989 Opinion & Order, *supra*, 708 F.Supp. at 1399.

More importantly, the Independent Administrator found that Yager aided and abetted this extortion, through action, and inaction. The Independent Administrator specifically found that Yager developed a special relationship with Roy Williams, since Yager "rose through the ranks [of the IBT] on Williams' coattails." Once in a position of fiduciary responsibility to the IBT membership, Yager took no action with respect to the undeniable fact that Williams was controlled by organized crime. At his deposition, Yager admitted that he was aware of the charges that Roy Williams was controlled by the Kansas City La Cosa Nostra. The extent of Yager's breach of his responsibility to the membership is reflected by his voting to re-elect Williams as chairman of the Central Conference of Teamsters Policy Committee *after* Williams had both been convicted of conspiring to bribe United States Senator Cannon, and cited by the Senate for his ties

---

listed in the Independent Administrator's veto decision and are filed with the Court as part of the public record.

**2.** That paragraph reads as follows:
"The Independent Administrator shall have the authority to veto whenever the Administrator reasonably believes that any of the actions or proposed actions ... constitutes or furthers an act of racketeering activity with in the definition of Title 18, U.S.C. § 1961, or furthers or contributes to the association, directly or indirectly, of the IBT or any of its members with the [La Cosa Nostra] or elements thereof:

\* \* \* \* \* \*

(iii) any appointment or proposed appointments to International Union office or any officer, agent, representative or employee of the IBT."

to organized crime, and after Yager himself had concluded that Williams was unfit to lead that segment of the IBT.

The Independent Administrator stated that Yager's failure to act under those circumstances "amount[ed] to an egregious breach of his responsibility as an officer of the IBT." The Independent Administrator concluded that "rewarding Mr. Yager with appointments to the powerful General Executive Board and as the Director of the Central Conference of Teamsters would only serve to further the very extortion of the members' rights which was initiated by Mr. Williams and fostered by Yager's silence and incomprehensible passivity." (Veto-decision at 30).

The Independent Administrator further found that the appointment of Yager would have an extortionate effect on the members' rights by the failure of the IBT General President and GEB to conduct any inquiry into Yager's fitness for these offices. The Independent Administrator concluded that the absence of such an inquiry would send a message that "the General President and General Executive Board [were] simply not concerned with ridding the IBT of the type of corruption that was epitomized by Williams himself." (Veto-decision at 35).

### B. Contributing to the Association of La Cosa Nostra

The Independent Administrator found as an independent ground for vetoing the Yager appointment that it would contribute to the association between the IBT and La Cosa Nostra. The Independent Administrator noted that the IBT is susceptible to infiltration by La Cosa Nostra as demonstrated in the extensive materials that form the record. The facts show that Yager was seen with members of La Cosa Nostra, including Civella, and members of the Chicago La Cosa Nostra. Further, the evidence indicates that Yager could not have been so closely affiliated with Williams without Yager having received La Cosa Nostra approval. At the very least, Yager, having longstanding knowledge of this infiltration, took no steps to impede it. (Veto-decision at 36–37).

### II. Standard of Review

■ The IBT argues that this Court may only affirm the decision of the Independent Administrator if it is supported by "substantial evidence." But this argument mistakes the well-settled standard of review that this Court and the Court of Appeals have given to determinations of the Independent Administrator.

Paragraph K.16 of the Consent Decree provides that this Court shall review the actions of the Independent Administrator using the "same standard applicable to review of final federal agency action under the Administrative Procedure Act." Consent Decree at 25. It is beyond dispute that under the Consent Decree, the decisions of the Independent Administrator are "entitled to great deference." *United States v. International Brotherhood of Teamsters*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990).

In their submission, the IBT argues that the evidence relied upon by the Independent Administrator amounts to "guilt by association" and would be insufficient to find that Yager criminally aided and abetted the violation of any law. But whether Yager could be convicted of a crime is not relevant. The authority and findings that must be made by the Independent Administrator in this matter are determined by the Consent Decree, which specifically enumerated the two grounds upon which the Independent Administrator can veto an appointment, and what standard that veto must meet. Consent Decree at F.12.(B)(iii). The Independent Administrator must only "reasonably believe" that an appointment would further an act of racketeering or contribute to the association of the IBT with organized crime. *Id.* Further, that finding is then given the deference this Court and the Court of Appeals must give determinations of the Independent Administrator.

This argument of the IBT is especially disingenuous considering the extensive al-

legations of La Cosa Nostra infiltration into the officers the IBT that began this entire litigation. The explicit and uncontroverted purpose of this Consent Decree is to rid the IBT of the hideous influence of organized crime, and the Independent Administrator's authority to act in that regard is clearly set out in the Consent Decree.

Accordingly, the findings of the Independent Administrator in his veto decision will be reviewed, as always, under the standard set out by the parties in the Consent Decree.

### III. The IBT's Challenges

■ The IBT challenges the veto decision of the Independent Administrator on the grounds that the facts demonstrate that Yager acted honestly and ethically throughout his career, and that the evidence does not establish that Yager either (i) committed the act of racketeering, or (ii) contributed to the IBT's association with organized crime. These challenges are without merit, and must be dismissed.

#### A. Yager Aided and Abetted an Act of Racketeering

The IBT argues that the Independent Administrator erred by finding that Yager committed an act of racketeering by aiding and abetting Roy Williams' extortion of IBT members rights to a democratic union. The IBT contends that Yager's inaction rather than action cannot constitute aiding and abetting. This argument is contrary to the established law.

As this Court has already held in the context of this case, the IBT rank and file's rights under the LMRDA, 29 U.S.C. § 411(a), are extortable property under the Hobbs Act, and the extortion of those rights may constitute an act of racketeering under the RICO statute, 18 U.S.C. § 1961(1). March 6, 1989 Opinion & Order, *supra*, 708 F.Supp. at 1399; *see also United States v. Local 560, supra*, 780 F.2d at 281–82.

This Court also directly held that failure by officers of the IBT to redress wrongdoing within the IBT could support liability for aiding and abetting the extortion of the IBT members' rights.

"Each defendant officer is a fiduciary with respect to the union members. They have a duty to disclose and remedy wrongdoing by the IBT.... [Such action may mean the GEB] aided and abetted other by failing to act when they had such a duty."

March 6, 1989 Opinion & Order, *supra*, 708 F.Supp. at 1401. As a result, when a union fiduciary such as Yager fails to act to remedy wrongdoing within the union, that constitutes aiding and abetting the extortion of IBT members' rights to democracy and free speech. Importantly, this Court has also noted that in the context of this case, the inaction of an IBT officer to redress corruption could only be through "conscious avoidance" given the scope of that corruption. *Id.* The Third Circuit has also held that the failure of an IBT officer to act when he had an affirmative duty to do so constituted aiding and abetting the extortion of the IBT members' rights. *United States v. Local 560, supra*, 780 F.2d at 284.

■ Further, aiding and abetting the extortion of members' rights to union democracy through failure to take action in the face of corruption is an act of racketeering, and thus formed part of the parties' background understanding as to what acts of racketeering would subject IBT appointments to veto pursuant to ¶ F.12.(B)(iii) of the Consent Decree. Indeed, the Court of Appeals has explicitly stated that "we deem the Consent Decree to incorporate prevailing legal standards," *United States v. International Brotherhood of Teamsters*, 931 F.2d 177, 189 (2d Cir.1991), and there can be no doubt that aiding and abetting the extortion of members' rights formed part of the background to this very case. Union officers owe an enhanced duty of care to their membership. *Id.* The IBT's argument that inaction in the face of union corruption could not constitute aiding and abetting is without merit.

Accordingly, the Independent Administrator's determination that aiding and abet-

ting the extortion of the IBT members' rights to union democracy is an act of racketeering is reasonable and not arbitrary or capricious.

The IBT further argues that the evidence is insufficient to find that Yager aided and abetted Roy Williams in extorting the IBT rank and file's rights to a democratic union. This argument is also without merit. The IBT does not dispute the corruption of Roy Williams, rather, it claims that Yager is the victim of "1950's vintage" guilt by association. Indeed, the IBT does not dispute any of the evidence relied upon by the Independent Administrator. Rather, they argue that Yager was low-level IBT official who was in no position to take any affirmative action with respect to the corruption he saw around him.

But this argument misses the fundamental point that as an IBT officer, Yager owed the membership the utmost duty to stop corrupt elements from extorting the memberships' rights. In 1983, Yager voted to re-elect Williams, a convicted felon with known and undisputed mob ties, to the chair of the Central Conference of Teamsters Policy Committee when Yager had determined that Williams was not fit for that office. Further, when himself a member of the Central Conference Policy Committee, Yager voted to expend IBT funds for Williams' defense in the Cannon bribery prosecution. Such action is improper "prior to a full determination on the merits." *Morrissey v. Segal,* 526 F.2d 121, 127 (2d Cir.1975). Yager co-chaired Williams' legal defense fund and solicited contributions for those fees.

Finally, the report by FBI Special Agent Wacks stated that Yager had associated with known organized crime figures, including Chicago La Cosa Nostra members Alan Dorfman, James Cozzo, and associates Amos Massa and Thomas O'Malley, Kansas City La Cosa Nostra members Paul Varsolona, Nick Civella, Carl Civella, Phil Simone, Sam Ancona, and Frank Todaro, and Detroit La Cosa Nostra member Anthony LaPiana. The open association of IBT leaders with figures involved with La Cosa Nostra results in the membership "surrender[ing] their right to democratic participation in the affairs of the union." *United States v. Local 560, supra,* 780 F.2d at 286.

Accordingly, considering all of the evidence relied upon by the Independent Administrator, his findings are sufficient to "reasonably believe" that the appointments of Yager would further the act of racketeering of aiding and abetting the extortion of the IBT members' rights to union democracy. At the very least, Yager's record of association with known organized crime figures would satisfy the second criteria relied upon by the Independent Administrator, that the appointment of Yager would directly or indirectly further the association of La Cosa Nostra with the IBT.

Further, the Independent Administrator's finding that the IBT's failure to conduct any background check on Yager before General–President McCarthy submitted Yager's name for approval by the GEB constitutes additional grounds for his veto is also supported by the evidence. The facts demonstrate that the General President McCarthy and the GEB failed to make any inquiry into Yager's fitness for office. General President ("G–P") McCarthy admitted so at his deposition.

JUDGE LACEY: Did you, yourself, conduct any interview of Mr. Yager before putting his name before the board?

G–P MCCARTHY: No, but I knew he was a good man and especially since the executive board voted unanimously and all hugged him and kissed him and so forth after it was over. I then knew definitely he was a good man.

JUDGE LACEY: ... [D]id you conduct any investigation of any kind into Mr. Yager's background before he was named?

G–P MCCARTHY: I said no.

(Deposition of William McCarthy, October 23, 1990, at 17–18).

The explicit purpose, spirit and intent of the Consent Decree is to rid the IBT of the hideous influence of organized crime. Considering the serious questions about the fitness of Mr. Yager for office raised by

his association with Roy Williams, which association was known to General President McCarthy and the members of the GEB, this failure to conduct any background investigation into Yager is egregious.

As a result, the IBT's challenges to the Independent Administrator's determination that the Yager appointments would further the act of racketeering are without merit and denied.

### B. Furthering the Direct or Indirect Association with La Cosa Nostra

The Independent Administrator determined as a full independent ground for his veto that the Yager appointments would further the direct or indirect association of the IBT with La Cosa Nostra. The extensive evidence linking Yager with organized crime associates demonstrates that this determination was neither arbitrary nor capricious.

The evidence relied upon by the Independent Administrator focused on the history of La Cosa Nostra influence on the IBT, particularly on the Central States Pension Fund, of which Yager was an officer. La Cosa Nostra engaged in a scheme to bribe former United States Senator Cannon by selling Pension Fund real estate to an investor group headed by Cannon at below market rates. The Independent Administrator concluded that such actions show how vulnerable the IBT is to the influence of La Cosa Nostra. The Independent Administrator found that Yager, having knowledge of this influence, did nothing to "prevent or impede it." As a result, the Independent Administrator concluded that the appointment of Yager would (i) signal that the IBT was still open to La Cosa Nostra infiltration by appointing the former protegee of Williams to the GEB, and (ii) send the message to the membership that the leadership has no intention to rid itself of the type of corruption typified by Roy Williams, and thus must be vetoed.

In its opposition to the veto, the IBT argues that (i) the evidence does not support that Yager himself has associated with organized crime figures, and (ii) the

Independent Administrator's conclusion that appointing Yager would further IBT association with La Cosa Nostra was unsupported speculation. Neither challenge has merit.

First, as previously discussed, the factual record is replete with evidence linking Yager with organized crime figures. The IBT does not even discuss that evidence. Second, considering the evidence linking Yager with convicted felon Roy Williams, and the extent of Yager's contact with organized crime, the IBT has in no way rebutted the reasonable finding that the appointment of Yager would further the association of the IBT with La Cosa Nostra is arbitrary or capricious.

Accordingly, the IBT's challenges to the veto decision of the Independent Administrator on the grounds that it did not establish that such appointments would further the association of the IBT with La Cosa Nostra is without merit and must be dismissed.

### IV. Conclusion

For the reasons stated above, the challenges to the veto decision of the Independent Administrator are without merit and must be denied.

IT IS HEREBY ORDERED that Application XV of the Independent Administrator is affirmed in all respects.

So Ordered.

### APPENDIX

### OFFICE OF THE INDEPENDENT ADMINISTRATOR

c o LeBOEUF, LAMB, LEIBY
& MacRAE
Gateway Center I, Suite 603
Newark, NJ 07102–5311
(201)643–8000
Fax (201)622–6693

November 28, 1990

Frederick B. Lacey
Independent Administrator

VIA FEDERAL EXPRESS

James T. Grady, Esq.
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, D.C. 20001

Re: *Jack B. Yager*

Dear Mr. Grady:

I have completed my review of the appointments of Mr. Yager as an International Vice President and as the Director of the Central Conference of Teamsters. In reviewing these two appointments, I have considered the following:

1. In-person sworn examination testimony of Jack B. Yager taken on October 24–25, 1990.[1]

2. In-person sworn examination testimony of General President William McCarthy taken October 23, 1990.

3. Testimony of IBT Vice President Arnold Weinmeister taken by telephone deposition on August 30, 1990.

4. Testimony of IBT Vice President Edward Lawson taken by telephone deposition on August 30, 1990.

5. Testimony of IBT Vice President Joseph Trerotola taken by telephone deposition on September 19, 1990.

6. Testimony of IBT Secretary–Treasurer Weldon Mathis taken by telephone deposition on August 16, 1990.

7. Testimony of IBT Vice President Jack Cox taken by telephone deposition on September 11, 1990.

8. Testimony of IBT Vice President Don West taken by telephone deposition on August 16, 1990.

9. Testimony of IBT Vice President Michael Riley taken by telephone deposition on September 18, 1990.

10. Testimony of IBT Vice President T.R. Cozza taken by telephone deposition on September 12, 1990.

11. Testimony of IBT Vice President George Vitale taken by telephone deposition on September 12, 1990.

12. Testimony of IBT Vice President Daniel Ligurotis taken by telephone deposition on August 16, 1990.

13. Testimony of IBT Vice President Francis Hackett taken by telephone deposition on September 11, 1990.

14. Testimony of IBT Vice President R.V. Durham taken by telephone deposition on September 27, 1990.

15. Testimony of IBT Vice President Mitchel Ledet taken by telephone deposition on August 30, 1990.

16. Testimony of IBT Vice President Joseph Morgan taken by telephone deposition on September 11, 1990.

17. In-person sworn examination testimony of Walter Shea taken on October 24, 1990.

18. Jack B. Yager—"A Personal History." Dated September 26, 1990, provided under cover of letter dated September 26, 1990, from David Uelmen, Esq.

19. Declaration of FBI Special Agent Peter J. Wacks dated October 22, 1990, which includes the following exhibits:

EX. A–1: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman, William Webbe, Joseph Lombardo, Amos Massa. Intercepted line: (312)693–8558. Date: January 30, 1979. Time: 1:08 P.M.

EX. A–2: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: William Webbe and Joseph Lombardo. Intercepted line: (312)693–8558. Date: February 2, 1979. Time: 2:31 P.M.

EX. A–3: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman and Amos Massa. Intercepted line: Allen Dorfman's office. Date: May 17, 1979. Time: 8:59 A.M.

EX. A–4: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorf-

[1] Reference throughout this letter to Mr. Yager's "examination" are to this testimony.

man and Joseph Lombardo. Intercepted line: Allen Dorfman's office. Date: May 17, 1979. Time: 12:12 P.M.

EX. A–5: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman, Joseph Lombardo, Amos Massa and Thomas O'Malley. Intercepted line: William Webbe's office. Date: January 7, 1979. Time: 1:42 P.M.

EX. A–6: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman, Thomas O'Malley, Amos Massa and Red Strate. Intercepted line: Allen Dorfman's office. Date: April 18, 1979. Time: 11:48 A.M.

EX. A–7: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman, William Webbe, Joseph Lombardo, Red Strate and Anthony Spilotro. Intercepted line: William Webbe's office. Date: May 1, 1979. Time: 10:46 A.M.

EX. A–8: Transcript of FBI intercepted conversation introduced into evidence at the Cannon bribery trial and sentencing hearing. Parties: Allen Dorfman, Joseph Lombardo, Sam Ancona and a "known" person. Intercepted line: William Webbe's office. Date: June 13, 1979. Time: 2:46 P.M.

EX. A–9: Transcript of FBI intercepted conversation pursuant to Court authorization in the Cannon bribery trial which was not used as evidence during the Cannon bribery trial. Parties: Jack Yager, William Webbe and Joseph Lombardo. Intercepted line: (312)693–8552. Date: February 2, 1979. Time: 1:20 P.M.

EX. A–10: Transcript of FBI intercepted conversation pursuant to Court authorization in the Cannon bribery trial which was not used as evidence during the Cannon bribery trial. Parties: Jack Yager and Roy Williams. Inter-

cepted line: (312)693–6208. Date: August 16, 1979. Time: 9:59 A.M.

EX. A–11: Transcript of FBI intercepted conversation pursuant to Court authorization in the Cannon bribery trial which was not used as evidence during the Cannon bribery trial. Parties: Jack Yager, "Medona" and "Flo." Intercepted line: (312)693–6209. Date: August 22, 1979. Time: 2:22 P.M.

EX. B: Staff paper submitted by investigator, David Williams, to the President's Commission On Organized Crime concerning payment of legal fees of Cannon bribery scheme defendants by the IBT, the Central States Pension Fund, and the Central Conference of Teamsters (1983).

EX. C: Deposition transcript of the testimony of Roy L. Williams in *United States v. IBT*, 88 Civ. 4486 (DNE) taken on December 1, 1988.

EX. D–1: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Allen Dorfman and Amos Massa. Intercepted line: Amalgamated Insurance Agency. Date: January 30, 1979. Time: 1:08 P.M.

EX. D–2: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Anthony Spilotro and Red Strate. Intercepted line: William Webbe's office. Date: May 1, 1979. Time: 10:56 P.M.

EX. D–3: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo and Allen Dorfman. Intercepted line: Allen Dorfman's office. Date: May 17, 1979. Time: 12:12 P.M.

EX. D–4: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Allen Dorfman and Amos Massa. Intercepted line: Allen Dorfman's office. Date: May 22, 1979. Time: 4:09 P.M.

EX. D–5: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Allen Dorfman and David Feldman. Intercepted line: Allen Dorfman's office. Date: June 13, 1979. Time: 3:32 P.M.

EX. D–6: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Unknown male, Joseph Lombardo, David Feldman, Sam Ancona and Allen Dorfman. Intercepted line: William Webbe's office. Date: June 13, 1979. Time: 2:46 P.M.

EX. D–7: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Allen Dorfman, Sam Ancona and William Webbe. Intercepted line: William Webbe's office. Date: August 14, 1979. Time: 10:28 A.M.

EX. D–8: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Thomas O'Malley, Allen Dorfman and Amos Massa. Intercepted line: William Webbe's office. Date: August 14, 1979. Time: 3:03 P.M.

EX. D–9: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Sam Ancona, Allen Dorfman and Amos Massa. Intercepted line: William Webbe's office. Date: November 7, 1979. Time: 2:27 P.M.

EX. D–10: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo and Allen Dorfman. Intercepted line: Allen Dorfman's office. Date: November 21, 1979. Time: 2:15 P.M.

EX. D–11: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lom-bardo, Allen Dorfman, Thomas O'Malley and Amos Massa. Intercepted line: William Webbe's office. Date: January 7, 1980. Time: 1:42 P.M.

EX. D–12: Transcript of FBI intercepted conversation which was introduced into evidence during the Argent Casino skimming trial. Parties: Joseph Lombardo, Allen Dorfman, Sam Ancona and Amos Massa. Intercepted line: William Webbe's office. Date: January 8, 1980. Time: 2:54 P.M.

EX. E: FBI–302 dated March 30, 1979, concerning agents overhear of March 25, 1979, conversation at Crown Center Hotel, Kansas City, Missouri, between Nick Civella, Joseph Lombardo, Allen Dorfman and Peter Tamburello.

EX. F: Transcript of testimony of Allen Glick taken in the Argent Casino skimming trial, *U.S. v. IBT*, Docket No. 83–00124–01/15, CR–W–8, from November 6, 1985 to November 14, 1985.

EX. G: Transcript of testimony of Special Agents Peter J. Wacks and William Ousely in the Lombardo Civil RICO trial dated October 16–17, 1989, 88 Civ. 4486 (DNE) (1988).

EX. H: Declaration dated October 17, 1989, of Clyde V. Summers offered as expert testimony in *U.S. v. IBT* 88 Civ. 4486 (DNE) (1988).

EX. I–1 to I–100: One hundred newspaper articles dated August 3, 1971, to June 12, 1988, which illustrate the extensive newspaper coverage in the Chicago, Illinois, and Kansas City, Missouri, metropolitan areas concerning the Cannon bribery scheme, the Argent Casino skimming scheme, IBT Local 41 (Kansas City, MO) corruption, and the long-standing LCN involvement in the affairs of the IBT, the Central Conference of Teamsters, and the Central States Pension Fund.

EX. J–1 to J–5: Five national magazine articles which were dated August 1974 to June 1986 which were published in Chicago, Illinois, and Kansas City, Missouri, metropolitan areas concerning LCN in-

fluence and corruption in the Teamsters Union.

EX. K: FBI–302 dated October 10, 1990, concerning interview of Jack Yarborough.

EX. L: FBI–302 dated October 5, 1990, concerning interview with Paul Steinberg.

EX. M: FBI–302 dated October 2, 1990, concerning interview with Sam Ancona.

EX. N: Deposition testimony of Thomas O'Malley taken on April 5, 1985, before the President's Commission on Organized Crime.

EX. O: LM–2 Annual Report filed by the International Brotherhood of Teamsters Central Conference.

EX. P: Transcript of an FBI intercepted conversation dated January 18, 1990, conducted pursuant to a court authorization at Leavenworth Federal Penitentiary between LCN associate Paul Varsolona, LCN Boss Nick Civella, and LCN underboss Carl Civella, concerning the sale of a ring to Jack Yager.

20. Report of Kroll Associates dated October 11, 1990.

21. Memorandum from Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, on behalf of Jack Yager, received on or about November 13, 1990.

22. Relevant portions of deposition of Mr. Roy L. Williams in *United States of America v. Anthony Salerno, et al.*, SS 86 CR. 245 (MJL) (S.D.N.Y.), March 18, 1987.

23. Deposition of Roy L. Williams dated September 13, 1985, before the President's Commission on Organized Crime, District of Columbia, in the matter of *Roy L. Williams, a Witness Subpoenaed by the President's Commission on Organized Crime.*

24. Relevant portions of testimony of Roy L. Williams before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, U.S. Senate, 96th Congress, 2nd Session,

"Oversignt Of Labor Department's Investigation Of Teamsters Central States Pension Fund," August and September, 1980."

25. Relevant portions of testimony of Roy L. Williams dated December 7, 1982, in *United States v. Allen Dorfman, et al.*, 81 CR 269, (N.D.Ill.) (Dec. 7, 1982).

26. FBI–302 dated December 9, 1983, re: interview of Roy L. Williams.

27. FBI–302 dated January 18, 1984, re: interview of Roy L. Williams.

28. FBI–302 dated February 6, 1984, re: interview of Roy L. Williams.

29. FBI–302 dated March 13, 1984, re: interview of Roy L. Williams.

30. FBI–302 dated September 4, 1985, re: interview of Roy L. Williams.

31. FBI–302 dated October 22, 1985, re: interview of Roy L. Williams.

32. FBI–302 dated November 19, 1985, re: interview of Roy L. Williams.

33. FBI–302 dated July 10, 1986, re: interview of Roy L. Williams.

34. FBI–302 dated October 24, 1986, re: interview of Roy L. Williams.

35. FBI–302 dated December 19, 1985, re: interview of Roy L. Williams.

36. Relevant portions of the Jackie Presser FBI Informant File—"The Alpro File."

37. Relevant portions of transcripts of FBI Intercepted Telephone Conversation involving Jack Yager dated February 2, 1979, August 13, 1979, August 16, 1979, August 20, 1979, August 21, 1979.

38. Letter dated November 27, 1985, to Gary S. Shapiro, Chicago Strike Force, to David B. Helfrey, Kansas City Strike Force re: sentence reduction of Roy Williams.

39. Letter of Agreement between Roy L. Williams and the United States dated February 24, 1987 re: non-prosecution in exchange for cooperation with government.

40. Agreement and Immunity Order dated May 14, 1985, from the President's Commission on Organized Crime re: Roy L. Williams.

41. Relevant portions of deposition testimony of FBI Special Agent Ouseley in *United States v. IBT, et al.,* 88 Civ. 4486 (DNE).

42. Declaration of FBI Special Agent Peter J. Wacks, dated October 16, 1989, submitted in *U.S. v. IBT,* 88 Civ. 4486 (DNE).

43. Arrest Record of Jack Brown Yager provided by United States Department of Justice, Federal Bureau of Investigation, Identification Division, Washington, D.C. 20537.

44. U.S. Department of Labor LM–2 annual reports for the years 1981, 1982, and 1989 filed by the Central Conference of Teamsters, Chicago, Illinois.

45. Chronological history prepared by the FBI entitled *Jack Yager—IBT VP Appointment Notes*—undated, but provided to Independent Administrator on or about September 17, 1990.

46. The trial testimony of FBI Special Agent Peter J. Wacks, which was taken on October 17–18, 1989, in *U.S. v. IBT, et al.,* 88 Civ. 4486 (DNE).

Taking all of the foregoing into consideration, I find that I can and do "reasonably believe[ ]" that the appointments of Mr. Yager "would ... further[ ] an act of racketeering activity within the definition of Title 18 U.S.C. § 1961, [and] further[ ] or contribute[ ] to the association directly or indirectly ... of the IBT or any of its members with the L[a] C[osa] N[ostra] or elements thereof." Consent Order, para. F.12(B) at p. 10. Thus, I am exercising my authority to veto the appointments. *Ibid.* Anticipating that the General President and/or the General Executive Board will exercise their option under the Consent Order to request the "reasons for" my veto, I will detail those reasons below. As I have previously indicated in my October 31, 1990, letter to Brendan V. Sullivan, Jr., Esq., IBT's counsel, if I determined to veto these appointments, I would do so by way of Application to Judge Edelstein. Thus I

shall do so. This shall serve as notice that an Application will be filed with Judge Edelstein on November 29, 1990. Moreover, as part of that Application, I will file with Judge Edelstein under seal a copy of this letter as well as a copy of Yager deposition transcript (along with exhibits), leaving it to him to determine whether these documents should be unsealed and filed with the Clerk of the Court. Pursuant to the Consent Order, the General President and/or the General Executive Board, have the right to seek review by Judge Edelstein of this veto for a period of up to fourteen days. You are also free, of course, to present your views to Judge Edelstein as to the unsealing of this letter and the Yager transcript.

### YAGER AND WILLIAMS

Mr. Yager first met Roy Williams in 1959, when Yager, a member of IBT Local 41, was a dock worker for Checker Express in Kansas City, Missouri, and Mr. Williams was the President of that Local. 10/24/90 T13–19 to 22 [2] and T15–14 to 16. *See also,* Ex. IA–1 (Jack B. Yager—"A Personal History"). Messrs Yager and Williams rose through the IBT ranks together. Their success culminated in Mr. Williams' appointment as International General President in 1981 and Yager serving as a member of the Policy Committee of the Central Conference and Administrative and Executive Assistant to Mr. Williams. 10/24/90 T84–19 to T85–5. *See also* Ex. IA–1. During his rise through the ranks, Mr. Williams served, among other positions, as the Chairman of the Central Conference of Teamsters Policy Committee, the Director of the Central Conference, an International Vice–President and a Trustee of the Central States Pension Fund. During his rise, Mr. Yager served, among other positions, as a Business Agent for Local 41, an Organizer for the Central Conference of Teamsters, Central Conference of Teamsters Freight Chairman, and Freight Division Director. Given Mr. Yager's close relationship with Mr. Williams one cannot ade-

---

**2.** References to transcripts will begin with the date of the transcript (in this case "10/24/90"), followed by the transcript page number (in this case "T13"), and concluding with a line reference (in this case "19 to 22").

quately consider Mr. Yager's appointment without first considering certain aspects of Mr. Williams' sordid career.

Following his 1982 conviction on charges that he and others conspired to bribe Senator Howard Cannon in connection with trucking deregulation legislation,[3] Mr. Williams testified in a number of federal proceedings and gave several interviews to the FBI. Mr. Williams freely admitted that during most of his IBT career he was controlled by Kansas City La Cosa Nostra Boss Nick Civella ("Civella"). That control was demonstrated, in part, by Mr. Williams: frequently meeting with Civella; receiving cash from Civella; giving Civella's cronies and followers IBT related jobs; as well as supporting, as a Central States Pension Fund Trustee, multi-million dollar Central States Pension Fund loans to mob-controlled firms for the purchase or renovation of Las Vegas gambling casinos.

During Mr. Yager's in-person sworn examination, I questioned him extensively concerning his knowledge of Mr. Williams' close ties to organized crime. The focus of that questioning centered on the press reports that were widely circulated in the Kansas City and Chicago areas—the two regions in which Mr. Yager has primarily lived and worked during the past thirty years. 10/24/90 T5–12 to T7–21. The majority of those press reports pre-date Mr. Williams' stunningly candid admissions (following his Cannon bribery conviction) concerning his nefarious ties to organized crime. Not only does a review of those press reports lead to the inescapable conclusion that Mr. Yager was put on notice of the frequent reports regarding Mr. Williams' wrongdoing; during his own examination, Mr. Yager admitted that at the time of these reports he was aware of the

contents of many of them and, in fact, the reports did "mean something to him." 10/25/90 T236–18.

For example, in September of 1980, Mr. Yager was serving as Mr. Williams' Executive Assistant in Chicago. 10/25/90 T216–22 to T217–7. On August 19, 1980, an article was published in the Kansas City Times with the headline "KC Teamster subpoenaed to testify." Ex. IA–29.[4] The first two paragraphs of that article read:

A key Teamsters union leader from Kansas City has been subpoenaed to testify at a Senate subcommittee hearing next week to determine whether the government has succeeded in efforts to reform the union's scandal-ridden Central States Pension Fund.

Roy Lee Williams, a ranking union vice president and head of Joint Council No. 56, based in Kansas City, is scheduled to testify Monday before the Senate Permanent Subcommittee on Investigations in Washington.

Mr. Yager acknowledged that he was aware of the fact that Mr. Williams was going to Washington to give testimony before the Senate subcommittee. 10/25/90 T218–4 to 6.

The article continues as follows:

The Central States Pension Fund has long been under investigation by the Justice Department for alleged improprieties, including allegations that organized crime figures received kickbacks and interest-free loans through their influence over big-ranking Teamsters officials.

When asked whether he was aware of the fact that there had been such an investigation under way, Mr. Yager responded:

Oh, absolutely. That was basically common knowledge. I think everybody in the City of Chicago knew that, Sir.

3. See United States v. Dorfman, 542 F.Supp. 345 (N.D.Ill.1982), aff'd sub nom. United States v. Williams, 737 F.2d 594 (7th Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Williams and his co-defendants were found guilty in connection with a scheme involving a conspiracy to bribe Senator Cannon, at the expense of the Central States Pension Fund, by selling at below market value Central States Pension Fund real estate to an investor

group headed by Cannon in exchange for his promising to defeat or delay proposed trucking deregulation legislation in Congress.

4. During my October 25, 1990, examination of Mr. Yager, I incorrectly identified the date of this article as September 29, 1980. 10/25/90 T216–2 to 5.

[10/25/90 T220–8 to 10]

Moreover, Mr. Yager stated that he was aware that in 1977 the Labor Department and the Internal Revenue Service required most of the Central States Pension Fund's trustees, including Williams, to resign their posts. 10/25/90 T220–11 to T221–9.

At his examination, I also asked Mr. Yager about an August 27, 1980, article from the Kansas City Times (Ex. IA–30) which reported in part as follows:

> Two years after he was forced to resign as a trustee of the $2.2 billion Central States Pension Fund, Roy Lee Williams met with Nick Civella in Kansas City concerning the fund's assets, Senate investigators said Tuesday.
>
> Contacts in 1979 between Williams, a Kansas City Teamsters leader, and Civella, reputed organized crime boss, had a direct bearing on actions taken by the current trustees who were installed to divorce the management of the fund from influence by the underworld, a Senate subcommittee was told.
>
> "We have evidence that some actions taken by the new trustees flowed from (the) alleged meetings." Sen. Sam Nunn, D–Ga., chairman of the Senate permanent subcommittee on investigations, said after the hearing adjourned.
>
> Questions asked of Williams by committee investigators—questions he refused to answer on grounds of self-incrimination—indicated the panel is seeking to establish whether former trustees with alleged ties to organized crime figures continue to exert control over the fund's assets.
>
> That link is one of the major concerns of the committee in its review of government attempts to reform the pension fund management.
>
> To that end, the committee subpoenaed Williams, who is vice president of the international, secretary-treasurer of the Central States Conference of Teamsters, president of Kansas City Local No. 41 and was a trustee of the pension fund from 1955 to 1977 when he and other trustees were forced to resign under government pressure amid allegations of wholesale misuse of the Teamsters funds.
>
> After a brief prepared statement, Williams declined to answer questions, citing Fifth Amendment protections against self-incrimination. He told the Senate Panel he is under investigation by several grand juries and had been—and may still be—"the subject of extensive electronic surveillance by the Department of Justice."

Mr. Yager testified that he was aware that Mr. Williams had invoked his Fifth Amendment privilege before the Senate subcommittee. 10/25/90 T224–11 to 17. While this was the subject of some discussion among Mr. Yager's fellow Teamsters, Mr. Yager never asked Mr. Williams why he invoked the privilege, and Mr. Williams never volunteered that information to Mr. Yager. 10/25/90 T224–18 to T225–22.

The August 27, 1980, Kansas City Times article continued in some detail to describe specific allegations concerning Civella's control over the Central States Pension Fund and his ties to Mr. Williams (including the dates and places of meetings between Civella and Williams). As evidenced by the many newspaper clippings marked as exhibits at Yager's examination, these allegations received widespread publicity at the time. Mr. Yager acknowledged that when he read about these allegations in the papers, it was "[d]amn upsetting" to him. 1–/25/90 T237–11.

Mr. Yager also acknowledged reading, in 1980, that federal authorities had obtained evidence that Mr. Williams received $1,500 a month in profits illegally skimmed from a Las Vegas Casino. 10/25/90 T263–10 to 15. *See also* Ex. IA–32. In this connection, Mr. Yager also acknowledged that "there was quite a lot in the paper about" the fact that organized crime figures were using Las Vegas casinos from which to skim money, and that mob figures were using the Central States Pension Fund to make loans to persons or entities who were using such loans to buy into Las Vegas casinos. 10/25/90 T267–19 to T268–21. *See also* Ex. IA–34. Again, a review of the

newspaper clippings shown Mr. Yager and marked as exhibits at his examination reveals that such allegations were reported time and time again in the Kansas City and Chicago press. At his deposition, Mr. Yager stated that based on these repeated news stories, it was clear to him that the federal authorities were directing such allegations against Mr. Williams, among others. 10/25/90 T274–17 to T275–2.

Mr. Yager also acknowledged that he was aware that the IBT General Executive Board selected Mr. Williams as its interim President in a meeting held in Las Vegas in May of 1981, just prior to the 1981 International Convention (the "1981 Convention"). 10/25/90 T280–8 to 13. *See also* Ex. IA–38. Mr. Williams' election as interim President followed the publication of many of the devastatingly critical press reports and the federal investigation into Mr. Williams and the Central State Pension Fund.

According to Mr. Yager, he attended the 1981 Convention in Las Vegas as a "nonvoting delegate." Mr. Williams was selected as the IBT President at that Convention. 10/25/90 T289–2 to 11. Shortly before the Convention convened, a draft Senate subcommittee report was issued attacking Mr. Williams' refusal to answer questions before that subcommittee. *See* Ex. IA–39. That report also tied information, derived from federal wiretaps and search warrants, to Mr. Williams. This information further supported the allegations of Mr. Williams' ties to members of organized crime including, of course, Nick Civella, the reputed boss of the Kansas City *La Cosa Nostra.* That same information underscored organized crime's connections to the Central States Pension Fund. In fact, according to one of the press reports, the wiretaps captured a conversation wherein Civella allegedly directed Mr. Williams to run for IBT General President. *See* Ex. IA–41. Another article reported that a spokesperson for the Senate subcommittee concluded that Mr. Williams "has no place in any position

of trust in the labor movement." *See* Ex. IA–42. I find that Mr. Yager was aware of these writings or others of the same substance. *See* 10/25/90 T–302–15 to 18.

At about the same time that the Senate subcommittee report was issued, Mr. Williams acknowledged, during a network television interview, that he had known Civella for 30 years, despite his having invoked before the Senate the Fifth Amendment when asked by its subcommittee whether he knew Civella. *See* Ex. IA–41. Mr. Yager acknowledged that about that time something came out in the "paper somewhere [in] Kansas City [or] Chicago" concerning the fact that Mr. Williams had known Civella for many decades. 10/25/90 T293–11 to 15. Mr. Yager also acknowledged that at the time of the 1981 Convention, there had been widespread publicity of the fact that when Mr. Williams first appeared before the Senate subcommittee, he invoked his Fifth Amendment privilege. 10/25/90 T307–7 to 11; T313–16 to 22. Mr. Yager also conceded that he was "probably sure" that everyone at the 1981 Convention was aware of the Senate subcommittee draft report. 10/25/90 T315–10 to 21.

It was also reported in the press, at the same time, that Senator Nunn, who chaired the hearings at which Mr. Williams invoked his Fifth Amendment privilege, stated that the "rank and file Teamster members and the beneficiaries of the Teamster Fund deserve a full accounting from Roy Lee Williams." *See* Ex. IA–44. According to Mr. Yager, Mr. Williams never gave such an accounting, either to Mr. Yager personally or to the rank and file. 10/25/90 T315–22 to T318–2.

Perhaps most amazing of all, and a sorry testament to the attitudes of Williams, the General Executive Board and the IBT membership, at the June 1981 Convention, just prior to being selected as President, Mr. Williams told the Convention delegates that he expected to be indicted. Mr. Yager was present when Mr. Williams made that statement. 10/25/90 T299–13 to T300–3.[5]

---

**5.** Apparently, the indictment Williams was expecting was the Cannon bribery scheme indict-   ment.

Difficult as it is for me to believe, during his examination, Mr. Yager stated that it was not until about the time of the 1981 Convention that he began to draw his own conclusions concerning all the allegations about Mr. Williams reported in the press and included in the Senate draft report and then decided that "[t]here's a hell of [a] lot to it." 10/25/90 T327–1 to 10. It is significant that Mr. Yager felt it necessary to state that at the time of the 1981 Convention, he did not believe that Mr. Williams was fit to be President of the IBT. 10/25/90 T333–6 to 9. On the other hand, given this candid admission by Mr. Yager, I find it shocking that in February 1983, while Mr. Yager was a member of the Policy Committee of the Central Conference of Teamsters, he and the other members of this Committee reelected Mr. Williams as the Chairman of the Policy Committee. 10/25/90 T345–1 to 21. In fact, one newspaper account reported Mr. Williams' reelection as follows:

> Williams beamed as he was unanimously re-elected to a new four-year term as chairman of the Teamsters' powerful Policy Committee by cheering delegates to the Central Conference of Teamsters Union. . . .
>
> [Ex. IA–83]

Mr. Yager, as a member of the Policy Committee, participated in the unanimous vote for Mr. Williams. *See* 10/24/90 T9–9 to 17 ("the Policy Committee elects[s] the chairman. . . ."). It is also quite revealing that Mr. Williams' reelection followed his federal conviction in the Cannon bribery scheme; and Mr. Yager, of course, knew not only of the conviction but of certain of the evidence offered by the government at the trial. 10/25/90 T345–22 to T361–5.

Mr. Yager also acknowledged that in or about October of 1985, he heard that Mr. Williams, now cooperating with federal authorities, testified in the "Deluna/Argent" Las Vegas casino skimming case. In that testimony, Mr. Williams admitted that for years he had been receiving $1,500 per month from Civella, that he had used his influence as a high ranking Teamster official to gain approval for a $62.5 million pension fund loans to finance Las Vegas casinos, and that he and Civella were very close friends. 10/25/90 T374–19 to T376–16. *See also* Ex. IA–94, 95.

Mr. Yager also acknowledged that he was aware that Mr. Williams, following his Cannon bribery conviction, had freely admitted that he was fearful of Civella. 10/25/90 T381–21 to 13. *See also* Ex. IA–97. Mr. Yager also recalled Mr. Williams testifying that Jimmy Hoffa had told him (Williams) that every big Teamster Local Union had connections with organized crime and that organized crime was imbedded in the IBT. 10/25/90 T381–21 to T382–4.

In summary, it is clear to me, following my examination of Mr. Yager, that given the extensive Kansas City and Chicago newspaper coverage commencing around the time of the Senate subcommittee hearings in 1980 probing into Mr. Williams' connections to organized crime, Mr. Yager was on notice of the extremely serious allegations that were hovering over Mr. Williams' head. Indeed, Mr. Yager admitted he was aware of such allegations, considered them serious, and concluded that based on the allegations, Williams was not fit to be IBT General President.

### THE IN–PERSON SWORN EXAMINATION OF GENERAL PRESIDENT MCCARTHY

The in-person sworn examination of General President McCarthy made it evident that Mr. McCarthy gave absolutely no consideration to Mr. Yager's relationship with Mr. Williams prior to appointing Mr. Yager as Director of the Central Conference and as an International Vice–President. Mr. McCarthy did not question Mr. Yager about his knowledge of Mr. Williams' mob ties, Mr. Williams' approval of Central State Pension Fund loans to mob controlled firms, or his involvement in the Cannon bribery scheme. In short, Mr. McCarthy did not conduct even a cursory independent investigation concerning Mr. Yager's knowledge of these events.[6] Mr. McCar-

---

6. In fact, Mr. McCarthy testified that he did not even remember that Mr. Williams had testified

thy's failure to scrutinize Yager is all the more troublesome given that Mr. McCarthy, after he became General President, and even as late as a few months before the appointments, had stated that he was thinking of removing Mr. Yager as the Freight Division Director because Mr. Yager was not doing his job. 10/23/90 T11–1 to 5.[7]

## THE TESTIMONY OF THE OTHER GEB MEMBERS

In reviewing Mr. McCarthy's two appointments of Mr. Yager, I examined every IBT Vice–President as well as the Secretary–Treasurer. Just as with General President McCarthy, it was clear that not a single member of the seventeen-person General Executive Board gave any consideration to Mr. Yager's connection to Mr. Williams when he unanimously approved Mr. Yager's appointment as Vice–President.[8] In fact the appointment was a complete surprise to everyone on the GEB, including Mr. Yager himself.[9]

Three General Executive Board members stated that they had assumed that Mr. McCarthy had investigated Mr. Yager's background and had satisfied himself with the results of that investigation. Three more members indicated that they simply

trusted Mr. McCarthy's judgment. Four did not know either way whether some sort of background check had been performed, and two thought I had already reviewed and approved the appointment. The remaining members simply acknowledged that they did not think a background investigation was performed.

When asked to assume certain facts about Mr. Yager, for instance, that during his working relationship with Mr. Williams, Mr. Yager knew of Mr. Williams' wrongdoing, but took no action in the face of such knowledge, the vast majority of the General Executive Board members indicated that they would have voted against the appointment or at least they would have questioned the appointment more thoroughly before voting.

## THE APPOINTMENTS OF MR. YAGER WOULD FURTHER AN ACT OF RACKETEERING ACTIVITY WITHIN THE DEFINITION OF 18 U.S.C. § 1961

Mr. Williams' mob ties, his approval of Central State Pension Fund loans to mob controlled entities at the behest of Nick Civella, and his scheme to bribe Senator Cannon, all served to extort the IBT's rank and file's LMRDA right to a democratic union in violation of 18 U.S.C. § 1951.

that while he (Williams) was General President, he was under the control of Kansas City mob boss Nick Civella. 10/23/90 T31–6 to 11. Mr. McCarthy also testified that he never read about Mr. Williams testifying that while he (Williams) was an officer of the IBT and associated with the Central States Pension Fund, he had supported pension fund loans to mob-controlled organizations in Las Vegas. 10/23/90 T331–3 to 9. I find it incredible that the leader of this Union was unaware of the shame brought upon it by Williams' conduct and his later revelations about that conduct. This reflects an attitude of callousness or indifference that this Union cannot afford in its leaders.

7.  It should also be noted that of the 17 depositions taken in this matter, the only obstruction I encountered was when I took the deposition of Mr. McCarthy. Counsel for Mr. McCarthy at that deposition, by his objections and interruptions, often made it difficult, if not impossible, to elicit any relevant information, which, I must assume, was counsel's objective. This was not a deposition taken in an adversary proceeding, a fact recognized by every one of the affiants (and

their counsel) except Mr. McCarthy. Moreover, by the time of Mr. McCarthy's deposition, I had sent to IBT counsel transcripts of four of the depositions of General Executive Board members who had voted on the Yager appointments. Mr. McCarthy and his counsel, presumably unhappy over the earlier testimony so fully given by these four General Executive Board members, chose a different course of objection after objection and interruption after interruption, hardly befitting one occupying the highest position in this Union.

8.  The General Executive Board did not vote on Mr. McCarthy's appointment of Mr. Yager as the Director of the Central Conference because no vote was required. In addition, it should be noted that I did not depose the three International Trustees, also members of the General Executive Board, in connection with my review of the Yager appointments.

9.  R.V. Durham testified, however, that the night before the appointment Mr. McCarthy confided in him that he intended to appoint Mr. Yager.

Such extortion has been recognized as a RICO predicate act under 18 U.S.C. § 1962(b) and as a racketeering activity under 18 U.S.C. § 1961. *See United States v. Local 560,* 581 F.Supp. 279 (D.N.J.1984), *aff'd and remanded,* 780 F.2d 267, 279–284 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

Mr. Yager's failure to act, considering the extent of his knowledge of Mr. William's reprehensible conduct, amounts to an egregious breach of his responsibility as an officer of the IBT. As stated by Judge Edelstein in *U.S. v. International Brotherhood of Teamsters,* 708 F.Supp. 1388, 1401 (S.D.N.Y.1989):

> Each defendant officer [10] is a fiduciary with respect to the union members. They have a duty to disclose and remedy wrongdoing.

Mr. Yager's failure to take any affirmative steps to remedy Mr. Williams' transgressions, and his failure to establish measures to prevent similar wrongdoings from recurring, served to aid and abet Mr. Williams' racketeering activity. *See, Local 560, supra,* 780 F.2d at pp. 283–284. ("[I]f an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from his inaction.")

In the memorandum submitted by Mr. Yager's attorneys following his in-person sworn examination (the "Yager Memorandum"), it is argued that Mr. Yager, when confronted with these repeated newspaper reports chronicling the allegations concerning Mr. Williams, had no choice but to continue "splitting the rails and driving the spikes." 10/25/90 T264–6 to 7. Yager Memorandum at p. 10. In fact, according to Mr. Yager, the one time he did try to confront Williams about the allegations he was told to "just take care of [his] job" as

it was "none of [his] business." 10/25/90 T264–1 to 6. It is further argued in the Yager Memorandum, at pp. 21–22:

> Should Yager have filed internal Union charges against Williams—his employer—based upon the newspaper stories and Senate hearing? How would he support such charges? What would a Union tribunal have done when faced with news stories and Williams' denials? Any Union member who read the newspapers, not just Jack Yager, could have filed charges over Williams' Fifth Amendment plea. But none did, not even the dissidents. It would be eminently unfair to single out Jack Yager for criticism in such circumstances, particularly in light of the ongoing investigations (Exhs. 29, 30). Indeed, to veto Jack Yager's appointment for this reason would be tantamount to holding that anyone belonging to the Union in 1981 is unfit to hold high office.

I do not accept Mr. Yager's defense that after he was told by Mr. Williams that he should mind his own business, he simply went back and did his job. Mr. Yager found himself in the center of one of the saddest chapters of this Union's history, and he elected not to question his superior's close involvement with organized crime or take any steps to find out if there was any merit to the widespread allegations. Such inaction on the part of Mr. Yager constitutes nothing more than his own "conscious avoidance of the facts," which, in and of itself, subjects him to RICO liability. *IBT, supra,* 708 F.Supp. at 1401. Accord, *Local 560, supra,* 581 F.Supp. at 332 (A union officer may be found guilty of aiding and abetting in the extortion of the members' rights where he is under an affirmative duty to act on behalf of the membership and he deliberately refuses to ei-

---

**10.** While the "defendant officers" referred to by Judge Edelstein in the underlying RICO suit were all members of the IBT General Executive Board, certainly Mr. Yager, who was, among other positions, an organizer for the Central Conference of Teamsters, the IBT Freight Director, a member of the Policy Committee of the Central Conference of Teamsters, and the Executive and Administrative Assistant to Williams, is to be held to a similar standard. *See* 29 U.S.C. § 501(a) ("The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group.")

ther act or investigate, *"i.e.,* the conscious avoidance of knowledge.")

Mr. Yager's timidity when faced with such riveting allegations is particularly striking given his testimony that he had no qualms about confronting Mr. Williams in the past. One example of this was a confrontation Mr. Yager had with Mr. Williams when Mr. Yager was job steward at Local 41 and Mr. Williams was the President of that Local. As explained by Mr. Yager.

A. [W]e had an argument one night at a board meeting.

Q. You had the temerity to argue with the president?

A. Yes, sir, if I thought he was wrong, yes, sir. What happened was that we were going over the bills again and now we were starting into—we [were] already into the ground-breaking on the new building which we [were] going to move into in six or seven months, so the bills were really coming in ... and it got to me and I looked at the bills and I asked questions on the bills, and this one night things really got out of hand and I said I want an answer. I'm not going to ... approve anything unless I get an answer.

And Mr. Williams came up out of his chair ... and he jumped up and threw everything off of his desk onto the floor, sir, and jumped up.

Well, when he did, I was standing up, too. And he says, "Well, I just don't understand this." I said, *"If it gets to where you can't ask questions, I don't belong here. As long as I'm here and until my term expires and if I'm not reelected, I'm going to continue to ask questions. I don't understand why you continue to have arguments."*

Anyway, after the meeting was over with ... Mr. Williams says "Jack, I just can't continue like this. You know, Jesus, every time I turn around" —I said, "Well, what do you want me to do?" I said, "I've explained it. *I'm not going to roll over for nobody.*

How can I just say this is okay and shove it over to you, Mr. Williams? I can't do that. If they feel that way fine; not me." [10/24/90 T44–16 to 47–2 (emphasis supplied) ]

Certainly, this is not the voice of a man who would easily shy away from confrontation. In fact, Mr. Williams rewarded Mr. Yager's tenacity by offering him a position as a Business Agent. 10/24/90 T47–3 to 7.

Mr. Yager's willingness to confront his superiors was demonstrated by another incident involving the then "Vice–President" William J. McCarthy which occurred while Mr. Yager was involved in the negotiations over the National Master Freight Agreement in 1988. As explained by Mr. Yager:

Oh, me and that Irishman [Mr. McCarthy] used to have some heated arguments going back to UPS negotiations and the last freight agreement negotiated. Mr. McCarthy was very—I'm bullheaded, but he also was bullheaded ...

In this particular case and at the time this happened, I didn't know he was going to be general president, but I would have done it anyway. *That's just the way I am.*

Anyway, we were hearing the New England deadlocks ... and I was chairman.... I said, "Okay, the parties are excused. Executive Session." The management got up, departed the room ... Billy [McCarthy] didn't get up. Okay?

I told him, "You're excused. We're in executive session." And it didn't go over too well with Mr. McCarthy. He was a vice president. There's no question about it....

He left and he sure in the hell didn't like that at all, and we made a decision. [10/24/90 T135–1 to 138–21 (emphasis supplied) ]

Again, this further demonstrates that Mr. Yager, when he decided it was appropriate to do so, had the courage to take a position. It is unfortunate that instead of forthrightly denouncing Mr. Williams when faced with the knowledge that Mr. Williams had "sold out" to organized crime, Mr. Yager

simply chose to put blinders on and ignored the allegations.

Mr. Yager's suggestion that he was in no position to address the allegations regarding Mr. Williams is disingenuous. First, Mr. Yager overlooks the special relationship he had with Mr. Williams—he was, after all, his Administrative and Executive Assistant and he rose through the ranks on Williams' coattails. In addition, Mr. Yager felt sufficiently close to Williams to co-chair the Williams defense fund which raised money for Williams' criminal defense of the Cannon bribery indictment. 10/25/90 T246–15 to 21. Mr. Yager, having access to Mr. Williams, could have, and indeed should have, confronted Mr. Williams with these allegations and effectively "gone public" by reporting what he knew to the federal investigating authorities and cooperating with them.

Second, and of equal significance, Mr. Yager, in a position in 1983 to address Mr. Williams' betrayal of the Union, voted in favor of reelecting Mr. Williams to the powerful post of Chairman of the Policy Committee of the Central Conference of Teamsters. By so doing he effectively joined in an endorsement of Mr. Williams' misconduct. This is all the more condemnable given the fact that the vote was taken *after:* (1) the revelations from the Senate subcommittee report had been widely publicized; (2) Mr. Yager had concluded that there was merit to the allegations in the Senate report; (3) Williams had been convicted in the Cannon bribery scheme; and (4) Mr. Yager had concluded that Williams was not fit to be General President. Mr. Yager could have, and should have, voted and lobbied against Williams' reelection under these circumstances.

Given all this, rewarding Mr. Yager with appointments to the powerful General Executive Board as an International Vice–President and as the Director of the Central Conference of Teamsters would only serve to further the very extortion of the members' rights which was initiated by Mr. Williams and fostered by Yager's silence and incomprehensible passivity. That Mr. McCarthy and the other General Executive Board members failed to conduct a proper investigation of Mr. Yager further compounds the extortion of the rights of the rank and file. As stated by United States District Judge Ackerman in *Local 560, supra,* 581 F.Supp. at 335:

> The officers of a labor organization occupy positions of trust in relation to that organization. As such, it is their duty to, among other things, hold the money and property of the labor organization on behalf of its members. See 29 U.S.C. § 501(a). Such officers should adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their labor organization.... Additionally, the officers have an affirmative duty and responsibility to ensure to the extent possible that the persons whom they appoint and retain in any position of trust within the labor union will adhere to the same high standards of responsibility and ethical conduct in administering the affairs of the union. In making such appointments, the incumbent union officers have an affirmative duty to insure that they obtain the true facts with respect to the character of the potential appointee and his or her discharge of the obligations of the position. An unreasonable failure to learn the true facts as to such appointments exposes these incumbent officials to liability for such conduct.... Similarly, in making such appointments, the incumbent officers have an affirmative duty to evaluate, to the greatest extent possible, the impact which any particular appointment might reasonably be expected to have on the membership in light to existing circumstances.

Certainly, in this case, Mr. McCarthy and his fellow General Executive Board members did not "insure that they obtain[ed] the true facts with respect to the character of [Mr. Yager] and his ... discharge of the obligations of the position...."

As stated at p. 330, *supra,* Mr. McCarthy did not even conduct a cursory independent investigation concerning Mr. Yager's knowledge of Mr. Williams' wrongdoing. If he had, he certainly would have learned, as I did, of Mr. Yager's familiarity with the

widespread allegations concerning Mr. Williams; Mr. Yager's failure to confront Williams with those allegations; and Mr. Yager's willingness to reelect Mr. Williams as the Chairman of the Policy Committee of the Central Conference under the circumstances already described.

In addition, if such an investigation had been conducted, Mr. McCarthy might then have concluded that perhaps Mr. Yager's knowledge of Williams' activities was not limited solely to the newspaper accounts. As stated by the private investigative firm, Kroll Associates, in its report to me:

> In the opinion of all the sources, Mr. Yager could not but know about organized crime's control of Roy Lee Williams and the Teamsters in Kansas. This view is held because of the universal belief that Mr. Williams and the Kansas City Teamsters have been in the iron-fisted grasp of Nick Civella's Mafia since the late 1950's. "He (Mr. Yager) is from Kansas City, so he had to know what was going on," said one official who knows him. "He was a player in the '60's (a period of Teamsters and mob violence) and you couldn't survive [there] as a union official without mob support," says another.

Moreover, Mr. Williams himself has testified that he was "sure" that "98 percent" of the IBT rank and file knew about his ties to the mob. *See* Deposition of Roy Williams March 16–17, 1987, in *United States v. Salerno*, SS 86 245 (MJL) (S.D. N.Y.) at p. 133. At yet another time, Mr. Williams testified that he made "no bones" about his ties to Civella. *See* Deposition of Roy Williams December 1, 1988, in *United States v. IBT*, 88 Civ. 4486 (DNE) (S.D. N.Y.) at p. 156.

Having found ample evidence of Mr. Yager's knowledge of the allegations surrounding Mr. Williams, vis-a-vis the countless press reports, I do not have to reach the question of whether Mr. Yager had other independent knowledge of Mr. Williams' wrongdoing. I do note, however, that such questions should have been ad-

dressed and resolved by the IBT before these appointments were made.

In a related context, an internal investigation by the IBT would have also revealed some pointed credibility gaps in Mr. Yager's testimony. Of particular note, Mr. Yager testified that he never took any trips with Allen Dorfman or William Webbe. 10/24/90 T105–22 to 106–5. As is well known, Mr. Dorfman was convicted in the Cannon bribery scheme but assassinated prior to sentencing. Mr. Webbe was an unindicted co-conspirator in that case. Mr. Webbe testified at the Cannon bribery trial that on the morning of January 10, 1979 (the day Mr. Williams and Mr. Dorfman met with Senator Cannon in Las Vegas), Webbe had breakfast at the Dunes Hotel in Las Vegas with Mr. Williams, Amos Massa (a former Central States Pension Fund Trustee, who was also convicted in the Cannon conspiracy case), a Mr. Peters (in all likelihood, Don Peters, formerly an IBT Vice President and Trustee of the Central States Pension Fund), *and Mr. Yager*. Mr. Webbe further testified that the next day (after the Williams/Dorfman/Cannon meeting), Messrs. Dorfman, Peters, Massa, Williams and Yager flew home from Las Vegas with Mr. Webbe in an IBT airplane. In fact, Mr. Webbe specifically testified that the airplane made a special stop in Kansas City to allow Messrs. Williams and Yager to depart. Again, given my findings, I need not reach this credibility issue; however, it can be reasonably inferred that Mr. Yager's denial of trips with Dorfman or Webbe was motivated by the desire to conceal his presence in Las Vegas during the fateful meeting with Senator Cannon and his knowledge of the purpose of the meeting.

In short, the appointment of Mr. Yager would further the extortion of the members' rights by virtue of the fact that:

1. Given Mr. Yager's past failure to investigate or at the very least confront Mr. Williams when faced with knowledge of Mr. Williams' wrongdoing, I do not believe that Mr. Yager, as the Director of the Central Conference of Teamsters and as an International Vice–President, would ad-

here to the high standards of responsibility and ethical conduct in administering the affairs of the IBT expected of him by the IBT Constitution and the law;

2. Both General President McCarthy and the other General Executive Board members breached their affirmative duty to obtain the true facts with respect to Mr. Yager's character and background prior to making and approving these appointments [11]; and perhaps most significantly;

3. General President McCarthy and the other General Executive Board members, breached their affirmative duty to evaluate, to the greatest extent possible, the impact which Mr. Yager's appointments might reasonably be expected to have on the IBT membership in light of existing circumstances.

In regard to this last factor, two conclusions readily come to mind. First, the rank and file, especially those in the Central Conference who are perhaps most familiar with Mr. Williams' misconduct, are sure to view the appointments of Mr. Yager as a message from the General President and the General Executive Board that the IBT leadership is simply not concerned with ridding the IBT of the type of corruption that was epitomized by Williams himself. In turn, such a message can only "intimidate the rank and file, and thus extort LMRDA rights in violation of the Hobbs Act [18 U.S.C. § 1951]." *Local 560, supra,* 780 F.2d at 286.

Second, beyond the concerns of the rank and file's LMRDA rights, the Consent Order entered into between the Government and the IBT leadership envisions an historic rank and file secret-ballot election of International Officers. Appointments such as Mr. Yager's, if permitted, conveying the message to the rank and file that the IBT leadership had investigated and found Mr. Yager suitable and qualified, would only serve to support the notion that he should be elected to the post of IBT Vice President.

It is obvious that Mr. McCarthy in making those two appointments, and the GEB in approving the Vice-Presidential appointment, either ignored the impact their actions would have on the rank and file or consciously intended to influence the rank and file in their evaluation of candidates at the next IBT election.

## THE APPOINTMENTS OF MR. YAGER WOULD DIRECTLY AND INDIRECTLY FURTHER AND CONTRIBUTE TO THE ASSOCIATION OF THE IBT WITH THE LA COSA NOSTRA OR ELEMENTS THEREOF

In addition to furthering an act of racketeering, I find that I can and do reasonably believe "that the appointments of Mr. Yager would directly and indirectly further and contribute to the association of the IBT with the La Cosa Nostra or elements thereof." This, in and of itself, is an independent basis for me to veto the Yager appointments. Consent Order, para. F.12.(13) at p. 10.

The extensive materials I have considered in my review of Mr. Yager's appointments brought home, quite strikingly, the extent to which the IBT is vulnerable to La Cosa Nostra infiltration. Mr. Yager, having knowledge of this infiltration, did nothing to prevent or impede it. If Mr. Yager were to be permitted to occupy the positions to which he was appointed, La Cosa Nostra, or elements thereof, might understandably be encouraged to initiate new contacts within the IBT or perhaps broaden contact already established. Certainly, elements of the La Cosa Nostra may view Mr. Yager's stoic silence and accommodation in the face of his knowledge of Mr. Williams' mob ties as, at the very least, highly suggestive that he then was, and now is, approachable as was his mentor, Mr. Williams. Similarly, if organized crime's contacts with other officers were brought to the attention of Mr. Yager, consistent with past practice, predictably he

---

**11.** Again, I am mindful of the fact that the General Executive Board only voted to approve the appointment of Mr. Yager as an International Vice-President.

would do nothing to disclose and terminate such contacts.[12]

Lastly, given his history, Mr. Yager cannot be expected to take affirmative steps to establish procedures and mechanisms which will serve to prevent La Cosa Nostra's infiltration into the IBT. All of these factors lead me to conclude that the Yager appointments would directly and indirectly further and contribute to the association of the IBT with the La Cosa Nostra and elements thereof.

## SUMMARY

I find that the appointments of Mr. Yager to the position of Director of the Central Conference of Teamsters and as International Vice–President must be vetoed based upon my reasonable belief that the appointments would: (1) further a racketeering activity—the extortion of the union members' rights to a democratic union; and (2) directly or indirectly further and contribute to the association of the IBT with the La Cosa Nostra or elements thereof.

## THE CONTEMPT ISSUE

On July 31, 1990, I wrote to you indicating that I was inclined to veto the Yager appointments. In the same letter I also suggested that Mr. Yager should not undertake any duties as International Vice–President or Director of the Central Conference until after I completed my review. As I explained, that suggestion was made because, quite frankly, given what information I had received about Mr. Yager's background, it would have been more prudent for Mr. McCarthy to have submitted Mr. Yager's name to me for investigation before making the appointments. Mr. Yager was sent a copy of that letter as was Mr. McCarthy, the Secretary–Treasurer and every Vice–President. On October 15, 1990, you wrote to me, acknowledging Mr. Yag-

er's participation in the vote to remove Mr. Joseph Treretola as Eastern Conference Director on October 8, 1990. In fact, in your letter, you referred to Mr. Yager as "Vice–President Yager." Mr. Yager confirmed his participation in the General Executive Board meeting in Florida at which the vote to oust Mr. Treretola was taken. [1–/24/90 T172–17 to T173–7.] I also note that in the latest edition of IBT "ROSTER" (October 1, 1990), Mr. Yager is listed as the "Fifteenth Vice President" and the "Director" of the Central Conference of Teamsters. In addition, in the most recent issue of *The International Teamster* in my possession (December 1990), Mr. Yager is also carried on the masthead as the "Fifteenth Vice President."

By separate letter I will present to the United States Department of Justice the question of whether it believes contempt proceedings should be instituted against Mr. McCarthy and Mr. Yager, or other members of the General Executive Board, in connection with Mr. Yager's participation in the Treretola vote and in the General Executive Board quarterly meeting in Florida. Of course, this is not intended as a statement that the Investigations Officer may not take any action he deems appropriate.

Very truly yours,
/s/ Frederick B. Lacey
Frederick B. Lacey

FBL:dsg.

---

**12.** I do note that on November 1, 1990, the Policy Committee of the Central Conference of Teamsters, of which Yager is the Chairman, decided to conduct an investigation of any connection which George Chiavola may have had to Nick Civella or other members of organized crime. *See* Yager Memorandum at pp. 16–17. At his examination, Mr. Yager testified that he learned approximately three weeks prior to his deposition that George Chiavola was one of three people that Roy Williams had hired at the request of Nick Civella. 10/25/90 T287–4 to 18. I cannot help but believe that this latest action was prompted by my coinciding scrutiny of Mr. Yager's background. Given Mr. Yager's history, I must question whether Mr. Yager would act as aggressively without the spotlight of my review on him.